EDMUND WRIGHT, as Trustee in Bankruptcy of W. C. LOFTUS & Co., Respondent, v. EDWARD HART, Appellant.

CONSTITUTIONAL LAW — INVALIDITY OF ACT REGULATING SALE OF MERCHANDISE IN BULK (L. 1902, CH. 528) — CONST. ART. 1, §§ 1, 6; FED. CONST. 14TH AMENDMENT, ART. 1. Chapter 528 of the Laws of 1902, making the sale of merchandise in bulk fraudulent and void as against creditors of the seller unless certain prescribed conditions are complied with, violates those clauses of the Federal and State Constitutions providing that no person shall be deprived of life, liberty or property without due process of law, and that no state shall deny to any person the equal protection of its laws, in that the statute affects the liberty and property of a limited class of citizens, arbitrarily and unnecessarily denies them the right to contract for, bargain and sell a particular kind of property, whether the sale is honest or dishonest, except upon conditions that are harsh, drastic, unreasonable and unnecessary in so far as they do not tend to effect the objects for which such a statute may properly be enacted, and so restricts the right of contract as to deprive property of its characteristics as such. While the power of the legislature to enact reasonable laws for the prevention of fraud and the protection of creditors is not questioned, the enactment cannot be regarded as a valid exercise of the police power, since that begins only where the Constitution ends.

*Wright* v. *Hart*, 103 App. Div. 218, reversed.

(Argued May 31, 1905; decided October 3, 1905.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered April 7, 1905, which affirmed an interlocutory judgment of Special Term overruling a demurrer to the complaint.

In November, 1903, a corporation known as W. C. Loftus & Co., engaged in the retail clothing and tailoring business in the city of New York, sold to the defendant its entire stock, fixtures and lease for a consideration of $22,953.86. Within a few days thereafter a petition in involuntary bankruptcy proceedings was filed against it, and the plaintiff was elected trustee thereunder. At the time of the sale referred to chapter 528 of the Laws of 1902 was in force, and it provided that: "Section 1. A sale of any portion of a stock of merchandise other than in the ordinary course of trade in the

regular and usual prosecution of the seller's business, or the sale of an entire stock of merchandise in bulk, shall be fraudulent and void as against the creditors of the seller, unless the seller and purchaser shall at least five days before the sale make a full and detailed inventory showing the quantity, and, so far as possible with the exercise of reasonable diligence, the cost price to the seller of each article to be included in the sale, and unless such purchaser shall at least five days before the sale, in good faith make full explicit inquiry of the seller as to the name and place of residence or place of business of each and every creditor of the seller and the amount owing each creditor, and unless the purchaser shall at least five days before the sale in good faith notify or cause to be notified personally or by registered mail each of the seller's creditors of whom the purchaser has knowledge, or can with the exercise of reasonable diligence acquire knowledge, of such proposed sale and of the stated cost price of merchandise to be sold and of the price proposed to be paid therefor by the purchaser. The seller shall at least five days before such sales file a truthful answer in writing of each and all of said inquiries."

The plaintiff, as trustee in bankruptcy of the selling corporation, has brought this action to set aside the sale on the ground that it was made without complying with any of the provisions of the statute. The purchasing defendant interposes the demurrer that the complaint does not state facts sufficient to constitute a cause of action because the statute is unconstitutional. This claim of unconstitutionality is based (1) upon article 1, section 1, of our State Constitution which provides, that " no member of this state shall be ` * * * deprived of any rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers ; " (2) upon article 1, section 6, of our State Constitution which provides that no person shall " be deprived of life, liberty or property without due process of law," and (3) upon article 1 of the 14th amendment to the Federal Constitution which provides that " no state shall make or enforce any law

which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

*Louis Marshall* and *Samuel P. Goldman* for appellant. The statute violates section 1 of article 1 of the New York State Constitution by depriving the vendor and vendee of the rights and privileges secured to them respectively, as citizens of the state; and section 6 of article 1 of said Constitution, and section 1 of article 14 of the amendments to the Constitution of the United States, by depriving them respectively of their liberty and property without due process of law. (*Colon* v. *Lisk,* 153 N. Y. 194; *Matter of Jacobs,* 98 N. Y. 98; *People* v. *Marx,* 99 N. Y. 377; *People* v. *Gillson,* 109 N. Y. 289; *People ex rel. Tyroler* v. *Warden,* 157 N. Y. 116; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *State* v. *Goodwill,* 33 W. Va. 179; *State* v. *Loomis,* 115 Mo. 307; *Foster* v. *Scott,* 136 N. Y. 577; *People ex rel. McPike* v. *Van de Carr,* 178 N.Y. 428; *Lawton* v. *Steele,* 152 U. S. 133.) The statute is a denial of the equal protection of the laws. (U. S. Const. 14th amdt. § 1; 113 U. S. 27; 165 id. 150; 183 id. 79; 184 id. 540.)

*Abram I. Elkus* and *Joseph M. Proskauer* for respondent. The statute involves merely the reasonable and proper regulation of trade and is reasonable in all its requirements. (*Squire* v. *Tellier,* 185 Mass. 18; *McDaniels* v. *Connell,* 71 Pac. Rep. 37; *Walp* v. *Mooar,* 76 Conn. 515; *Matter of Farrell,* 9 Am. Bank. Rep. 341; *Hart* v. *Rooney,* 93 Md. 432; *Neas* v. *Borches,* 71 S. W. Rep. 50; *Fisher* v. *Homan,* 95 N. W. Rep. 392; *State* v. *Artus,* 34 So. Rep. 596.) The statute is a valid exercise of police power and violates no constitutional restriction. (*Whiteley* v. *Terry,* 83 App. Div. 197; *People* v. *Budd,* 117 N. Y. 1; *People* v. *Havnor,* 149 N. Y. 195; *People* v. *Ewer,* 141 N. Y. 129; *Village of Carthage* v. *Frederick,* 122 N. Y. 268; *People* v. *Noelke,* 94 N. Y. 137; *People* v. *West,* 106 N. Y. 295; *U. S.* v.

*Hume,* 106 U. S. 629, 644; *Matter of Jacobs,* 98 N. Y. 110; *Slaughter House Cases,* 16 Wall. 36; *Head* v. *Amoskeag Co.,* 113 U. S. 9; *Frisbie* v. *U. S.,* 157 U. S. 160; *Hopper* v. *California,* 155 U. S. 648; *Dent* v. *West Va.,* 129 U. S. 111; *Mugler* v. *Kansas,* 123 U. S. 623.)

WERNER, J.   Before proceeding to a critical view of the challenged statute it may be profitable to make a few pertinent though trite observations on the nature, construction and effect of written constitutions.   A written constitution is the fundamental expression of the sovereign will.   Under our form of government that sovereign will resides in the people. A written constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government in respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it.   It is true, as was said by Judge Cooley, that " the weaknesses of a written constitution are that it establishes iron rules which, when found inconvenient, are difficult of change; that it is often construed on technical principles of verbal criticism rather than in the light of great principles, and that it is likely to invade the domain of ordinary legislation instead of being restricted to fundamental rules."   The logical corollary of the proposition that the Constitution is the supreme law of the land is that the power to legislate is a a purely delegated one, derived from the Constitution and controlled by it.   In the case at bar we are concerned with no quibbles of verbiage or technicalities of construction, but with the broad question whether an act of our legislature is repugnant to the " iron rule " of our Federal and State Constitutions that no citizen shall be deprived of " life, liberty or property," or be denied the " equal protection of the laws."

In the course of judicial interpretation, the words " liberty " and " property " as used in the Constitutions, have naturally and properly been given their most comprehensive signification, so that they embrace every form and phase of individual

right that is not necessarily taken away by some valid law for the general good. "The term 'liberty,' as protected by the Constitution, is not cramped into a mere freedom from physical restraint of the person of the citizen, as by incarceration, but it is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare." (*People* v. *Marx*, 99 N. Y. 377.) "All laws, therefore, which impair or trammel these rights, which limit one in his choice of a trade or profession, or confine him to work or live in a specified locality, or exclude him from his own house, or restrain his otherwise lawful movements (except as such laws may be passed in the exercise by the legislature of the police power), are infringements upon his fundamental rights of liberty, which are under constitutional protection." (*In re Jacobs*, 98 N. Y. 98.). "'Liberty' * * * includes the right to acquire property, and that means and includes the right to make and enforce contracts." (*State* v. *Loomis*, 115 Mo. 307; *Allgeyer* v. *Louisiana*, 165 U. S. 578.) The right to use, buy and sell property is protected by the Constitution, and "when the law annihilates the value of property, and strips it of its attributes by which alone it is distinguished as property, the owner is deprived of it according to the plainest interpretation, and certainly within the constitutional provision intended expressly to shield personal rights from the exercise of arbitrary power." (*Wyne-hamer* v. *People*, 13 N. Y. 378, 398; *People ex rel. Manh. S. Instn.* v. *Otis*, 90 N. Y. 48.)

Let us now analyze the statute under scrutiny. Every sale (A) "of any portion of a stock of merchandise, other than in the ordinary course of trade in the regular and usual prosecution of the seller's business, or (B) the sale of an entire stock of merchandise in bulk, *shall be fraudulent and void* as against the creditors of the seller, unless (1) the seller *and* purchaser shall at least five days *before* the sale, (2) make a full and detailed inventory, (3) showing the quantity, and, so far as possible with the exercise of reasonable diligence, (4)

the cost price to the seller of *each article* to be included in the sale, and unless (5) such purchaser shall *at least five days before the sale* in good faith make full, explicit inquiry of the seller as to the (6) name and place of residence or place of business of each and every creditor of the seller, and (7) the amount owing each creditor, and unless (8) the purchaser shall *at least five days before the sale* in good faith (9) notify or cause to be notified personally or by registered mail each of the seller's creditors of whom the purchaser has knowledge, or can with the exercise of reasonable diligence acquire knowledge of such proposed sale, and (10) of the stated cost price of merchandise to be sold, and (11) of the price to be paid therefor by the purchaser. (12) The seller shall *at least five days before such sale* file a truthful answer in writing of each and all of said inquiries."

No one will have the temerity to suggest that this drastic and cumbersome statute is not in restraint of the rights of "liberty" and "property," as those terms have been judicially declared to have been used in the Federal and State Constitutions. It is contended, however, that the restraint which it imposes upon these rights is justifiable under that shibboleth of legislatures and courts known as the police power. Far be it from us to deny the existence of that power or to attempt to define its extent. It will be our effort, rather, to show that the statute under consideration is, in some particulars, so thoroughly unrelated to the probable object of its enactment, and in others so cumbersome, burdensome, unreasonable and unworkable, as to violate every one of the constitutional provisions under which it is challenged. The rights of "liberty" and "property," as we have seen, are sacred and substantial rights guaranteed by the Federal and State Constitutions. Any law that interferes with the right to make and enforce contracts affects both the liberty and property of the citizen. The right to sell and purchase merchandise in bulk is no less under the protection of the Constitution than the right to sell and buy in the smallest possible quantities. Any legislative interference with either of these rights, that

is clearly forbidden as to the other, can only be justified on the ground of public necessity, which is but another way of saying that it is for the general welfare. Such interference should not only be based upon public necessity, but it should be conservative, reasonable and well adapted to the end sought to be attained. Until the 11th day of April, 1902, it was just as lawful in this state to sell any portion of a stock of merchandise, or the whole of such a stock in bulk, as to sell the same goods piece by piece at retail. By the statute which went into operation on that day, the sale of any stock of merchandise in bulk, or of any considerable portion thereof, was made unlawful as against the creditors of the seller, unless both seller and purchaser should do many things that were clearly and substantially restrictive of the right of contract as it had theretofore been enjoyed in respect of such property. This criticism of the statute is sought to be answered by the plea that the law was designed to correct a great public evil; that it was aimed at a class of merchants who have engaged in the fraudulent practice of obtaining merchandise on credit for the purpose of making hasty and secret sales thereof in bulk and then decamping with, or otherwise disposing of, the proceeds at the expense of their creditors. It may be conceded that this was the ostensible purpose of the statute, and that the evil complained of was one of substantial reality and magnitude, for which an efficacious remedy was much to be desired. But that does not meet the argument against the constitutionality of the statute. The question still remains whether the legislature has not overstepped the limits of its power, by practically placing an embargo upon all sales of merchandise in bulk, under the guise of a statute ostensibly designed to prevent frauds in such sales.

Beginning with the title of the statute, we observe that its object is "to regulate the sale of merchandise in bulk." If we give to the term "merchandise" its ordinary business signification, there is no escape from the conclusion that the statute applies to merchants alone as distinguished from

manufacturers, farmers, bankers, the members of the several professions, mechanics, etc.   Under this construction of the law the merchant is prohibited from doing that which is permitted to all other men.   Merchants comprise a comparatively small number of the community at large and, therefore, this would seem to be class legislation which denies to those affected by it the equal protection of the laws guaranteed by the 14th amendment to the Federal Constitution.   If the term "merchandise" is given a somewhat more liberal interpretation, so as to include finished manufactured products, and the stocks of jobbers and wholesale merchants, the statute is still open to the criticism that it denies the equal protection of the laws to all citizens, because it imposes upon certain classes, such as manufacturers, jobbers and wholesale merchants, burdens that are destructive of their legitimate business.   It is common knowledge that in this age of large enterprises many merchants purchase the whole products of mills and factories.   In the case of the jobber or the wholesale merchant these products are again sold in bulk, or in large but varying quantities.   If the manufacturer, jobber or wholesale merchant sell their entire stocks in bulk, the statute applies without regard to the question whether the sale is according to long-established custom, or in the regular course of trade. If there is a sale in bulk of less than the whole, then the validity of the sale is made dependent to some extent upon the question whether it is in the ordinary course of trade in the regular and usual prosecution of the seller's business. What is the ordinary course of trade in the regular and usual prosecution of such a seller's business ?   The manufacturer may dispose of his entire output to a single purchaser during a single year, or a series of years.   Again, he may dispose of it in parcels to several purchasers.   And yet again he may be compelled to rely upon a general market with purchasers from different quarters in varying quantities.   On the first of January of a given year he may know to a certainty just how much he will produce and just where it will go.   At the beginning of the next year he may not know what the mor-

22

row will bring forth. This is as true of the jobber and the
wholesale merchant as of the manufacturer. And what is the
net result? In the years when there is a single sale of the
whole output, the statute applies without regard to the ordi-
nary course of trade or the regular and usual prosecution of
the seller's business. In other years when the sales, although
in bulk are in smaller quantities, the application of the statute
depends, not upon the honesty of the transaction, but upon
the shadowy question whether it is in the ordinary course of
trade in the regular and usual conduct of the seller's business.
And all this is as applicable to the purchaser as to the seller,
although the former may have not the remotest knowledge of
the manner in which the business of the latter is carried on.
There are other and more serious constitutional objections to
this statute in so far as it may affect the manufacturer, the
jobber and the wholesale merchant, but as these objections
militate against the statute in its relation to all classes of men,
we shall consider them in their general bearing upon the
"liberty" and "property" clauses of the two Constitutions.

The statute, as we have seen, discriminates between sales of
entire stocks in bulk, and sales of portions of such stocks.
But it does not differentiate between sales that are honestly
made and sales that are made with intent to defraud. The
sale of an entire stock is declared to be fraudulent and void as
against the seller's creditors, no matter how solvent he may
be, unless all the petty and harassing details of the statute are
observed. The sale of a lesser quantity, however, is inter-
dicted by no such sweeping fiat so long as it is made in the
ordinary course of trade in the regular and usual conduct of
the seller's business, although made with a fraudulent intent.
But this is not all. Both seller and purchaser shall, at least
five days *before the sale,* make a full and detailed inventory.
One inventory is not enough. There must be two, or at least
one joined in by both. And they must be made, not when
the sale has been consummated, but five days before. Could
anything be devised that would more effectually paralyze sales
of merchandise in bulk? Some simple illustrations will

clearly outline the pernicious possibilities of this unique pro-
vision.   A is the owner of a stock of goods which he is will-
ing to sell, and which B is ready to purchase at a price agreed
upon.   Each may think he is making a good bargain.   A is
anxious to sell at once so that he may use the proceeds in
making another purchase of advantage.   B wants to close the
sale at once because he has an immediate and profitable market
for the goods.   If either has to wait five days or longer, and
particularly for the purpose of making an inventory involving
great labor and expense, he may prefer to drop the whole
matter.   Suppose, however, that the work of taking an inven-
tory is commenced, and during its progress the market price
rises or falls, or that either the seller or the purchaser dis-
covers that he has made a poor bargain because the inventory
discloses a greater or less value than was in the minds of the
parties when the price was fixed.   In such a case either the
party may refuse to go on with the inventory or to file it if
it is finished, and the result is that the person who may
feel aggrieved has no remedy, because the statute imposes
no penalty for failure to complete or file an inventory, and
there can be no valid sale until both of these things are done.

And what must such an inventory contain?   *First*, the
quantity.   That is usually and of itself entirely sufficient in
the case of a sale in bulk.   *Second*, the cost price to the
seller of *each article* to be included in the sale, although the
purchaser, one of the parties who must file an inventory,
may have no means of knowing anything about the cost
price to the seller.   It is true that the latter feature of the
inventory is only made necessary in so far as it is possible
with the exercise of reasonable diligence.   But the seller may
have full knowledge on the subject, which he may decide not
to disclose.   The purchaser may know nothing about it, but
his bargain can be annihilated by the seller's refusal to exer-
cise the " due diligence " by which the information could be
disclosed.   Then again, a purchaser may have a market for
goods which he is willing to purchase at a specified price.
This market he would lose if compelled to file a long and

detailed inventory containing the cost price to the seller.   And the inventory must be filed.   While the statute does not designate the place of filing, it would be of no value unless in some place where the inventory would become public property. Such an inventory, moreover, is not only unnecessarily burdensome, but practically prohibitory of such sales.   Not only the quantity of the goods sold, but the cost price *of each article* must be given in detail.   This requires a disclosure of the very secrets that make sales in bulk a business possibility, and entails upon the prospective contractors many details that in a given case may require weeks or months, and that neither may care to go into.   In the case of a sale of the whole or any part of the stock of a great department store, for instance, the cost price to the seller of every paper of pins or fine tooth comb would have to be inventoried, although the producing cause of the sale might be based upon considerations that would utterly fail if such infinitesimal matters had to be taken into account.

The next requirement of the statute has to do with the purchaser alone.   At least five days *before the sale* he must make full, explicit inquiry of the seller as to the name and place of residence or business of each of the seller's creditors, and of the amount owing to him, and, having done this, he must then notify or cause to be notified each of such creditors, personally or by registered letter, of the *proposed sale* and the stated cost price of the merchandise, as well as the price to be paid by the purchaser.   In other words, the purchaser, who is under no legal or moral obligation to the seller's creditors, is not only required to obtain from the seller all these details concerning his creditors, but he must send to each one, no matter how great their number or how remote their places of residence or business, all the detailed information that is to be included in the inventory.   Thus the inventory may have to be duplicated by the hundreds or thousands and sent to creditors scattered over all portions of the globe.   It is true that this obligation rests upon the purchaser only to the extent that it can be fulfilled in the exercise of reasonable diligence, but this

qualification emphasizes rather than mitigates the arbitrary command of the statute. And, finally, the seller shall, at least five days *before such sale*, file a truthful answer in writing to each and all of said inquiries. There is no intimation as to the place of filing, or as to what will happen if there is no filing. Neither are we informed as to the effect upon the purchaser, of the seller's failure to tell the truth or to file his written answers. In the midst of such a mass of detail it is refreshing to feel that this trifle is left to the imagination.

Let us again emphasize the assertion that we do not question the power of the legislature to enact reasonable laws for the prevention of fraud and the protection of creditors. That this right falls within the general scope of the police power no one will deny. But the police power only begins where the Constitution ends. Broad and comprehensive as the police power concededly is, and incapable of precise definition or exact demarkation as we know it to be, it is never difficult to determine that its limits have been transcended when it is clear that the sacred domain of the Constitution has been trespassed upon. And when the exercise of the police power clearly infringes upon vested constitutional rights, courts should not concern themselves with the probable purposes for which it is exercised, or the evils which it was designed to correct. First the Constitution and then the police power. The statute under consideration sweeps away the constitutional rights of liberty and property of a limited class of our citizens who are entitled to the equal protection of the laws with all other citizens. It invades the right of liberty because it arbitrarily and unnecessarily denies the right of a specified class of citizens to contract for, bargain and sell a particular kind of property. It violates the Constitution in prohibiting all sales of merchandise in bulk, whether honest or dishonest, except upon conditions that are harsh, drastic, unreasonable and unnecessary in so far as they do not tend to effectuate the objects for which such a statute may properly be enacted. It ignores the constitutional

guaranty relating to property rights because it so restricts the right of contract as to deprive property of its characteristics as such.

It is urged, however, that the impositions of this statute are more nominal than real, since a seller has only to pay his debts in order to make his sale valid. The argument, so far from supporting the statute, really serves to disclose one of its most sweeping and unreasonable features. If the statute affected none but insolvent sellers, or related merely to debts due, or gave to purchase-price creditors an equitable lien for their respective shares of the proceeds of a proposed sale, or if, instead of interdicting in advance a sale in bulk, it had made some reasonable provision for impounding the proceeds of sale until the seller's legal obligations could be judicially ascertained, there might be some force in the suggestion. But what is the fact? The act embraces all sales of entire stocks of merchandise in bulk. It covers every sale of any part of a stock not made in the ordinary course of trade in the regular and usual prosecution of the seller's business. It requires notice to be given to all the seller's creditors, whether their debts are due or not, that a sale is contemplated. It requires this notice to be given five days in advance of a sale. It requires observance of every one of its details or payment of every creditor. What is the practical effect? A seller who is abundantly able to pay his debts is compelled by law to do so before he can dispose of a part of his possessions. He must pay his debts whether they are due or not. He must pay them whether they are in dispute or not. He must pay creditors who have no legal, equitable or moral claim upon the particular property or its proceeds. And if he depends upon the proceeds of the particular sale to pay his debts, he must pay them at least five days before he gets the money. Thus an intending seller is under the necessity of practically obtaining the consent of his creditors before he can make a sale. He must pay a claim that may be in dispute, right or wrong, and he must take what equitably belongs to the creditor for purchase price and pay it to general creditors, or he

can be "held up." This may not be a literal taking of property without due process of law, but it is an annihilation of its value and a destruction of its attributes, so that while the owner is permitted to retain his property in name he is deprived of its essence and substance. (*Wynehamer* v. *People, supra.*)

It is said also that similar statutes, some of them much more drastic, have been adopted in twenty different states or jurisdictions. Twenty wrongs can never make one right. There is, moreover, a singular, not to say suspicious, coincidence in the time and substance of all this legislation. We are indebted to our brother BARTLETT for the suggestion that more than half of these statutes were enacted in 1903 and 1904, and nearly all of them since 1900. Statutes that are passed *pro bono publico* rarely sweep the country with such irresistible momentum, while much fantastic legislation has resulted from organized crusades upon legislatures by the advocates and supporters of special classes. This statute "is evidently of that kind which has been so frequent of late, a kind which is meant to protect some class in the community against the fair, free and full competition of some other class, the members of the former class thinking it impossible to hold their own against such competition and, therefore, flying to the legislature to secure some enactment which shall operate favorably to them or unfavorably to their competitors." (PECKHAM, J., in *People* v. *Gillson*, 109 N. Y. 389.)

If we have succeeded in making our position plain, it will be unnecessary to answer in detail that portion of Judge VANN's very learned and able opinion in which he illustrates the manifold purposes for which the police power has been exercised by legislatures and upheld by courts. The existence of the power is not denied. Its limits cannot be accurately demarked. The well-beaten paths which it has pursued time out of mind contain no guide board to the new and untrodden field sought to be explored by this particular phase of paternal legislation. Therefore, old cases and old laws are of little help except as they expound general principles appli-

cable to special conditions.   In its final analysis the question
is one of power in this particular case.   We think that power
has been transcended.   "To justify the state in interposing
its authority in behalf of the public it must appear, *first*, that
the interests of the public generally, as distinguished from
those of a particular class, require such interference; and,
*second*, that the means are reasonably necessary for the accom-
plishment of the purpose and not unduly oppressive upon
individuals.   The legislature may not, under the guise of
protecting public interests, arbitrarily interfere with private
business, or impose unusual and unnecessary restrictions upon
lawful occupations." (*Colon* v. *Lisk*, 153 N. Y. 188; *Law-
ton* v. *Steele*, 152 U. S. 133, 137.)   It cannot be reiterated
too often that the police power must be exercised within its
proper sphere, and by appropriate methods.   Whenever a
statute arbitrarily strikes down private rights, invades per-
sonal freedom or confiscates or destroys private property, it
is repugnant to the Constitution and should not be permitted
to stand, no matter how laudable its purpose or beneficial its
effect.

Owing to the length of this opinion we refrain from dis-
cussing the cases decided in other states upon similar statutes,
except to say that those which have been upheld in Massa-
chusetts, Connecticut, Tennessee and Washington are far less
drastic than our own, in that they either except from their
operation all sales by executors, administrators, receivers, etc.,
or provide that sales of merchandise in bulk shall only
be presumptively void if the statutory requirements are not
observed; or, as in Connecticut, that one day after the sale
there shall be filed a descriptive writing duly signed and
acknowledged.   In Ohio and Utah, where such legislation
was condemned by the courts, it was in some respects even
more far reaching and burdensome than here.

The judgment of the Special Term and Appellate Division
should be reversed and judgment ordered sustaining defend-
ant's demurrer, with costs in all the courts.

Question certified answered in the negative.

H<small>AIGHT</small>, J.   I concur in the opinion of W<small>ERNER</small>, J.   He has called attention to the defects in the statute in not specifying the place where the inquiries shall be filed.   But in addition thereto the notice to creditors provided for means non-resident as well as resident creditors.   The notice to creditors must be served either personally or by registered mail at least five days before the sale.   The notice would be of no benefit unless it was received before the sale was completed and in time for the creditor to take action in reference thereto.   The statute has, therefore, fixed the period of five days.   If the notice is served personally it must be five days before sale. If by registered mail, the statute doubtless means the same thing; that is, the notice should be received at least five days before the sale.   In other words, if the service is by registered mail, the posting must take place a sufficient time in advance so that the creditor may receive it at least five days before the sale is completed.   (*Steinhardt* v. *Bingham*, 182 N. Y. 326.)   In case of creditors so far removed as to be beyond the reach of the registered mail, personal service only would answer the requirements of the statute. Such a notice in many cases might be impossible, or if it could be given, it might involve not only so much time but so much expense as to render the purchase profitless and operate to defeat the sale.   In case the sale is very large, as for instance that of a large department store, weeks must elapse after the parties have made their agreement before they can complete the same.   An inventory of *every* article must be made and the cost price of each article must be stated.   This necessarily would consume considerable time.   The inventory, no matter how extensive or bulky, must be duplicated for each creditor, for the statute could only be complied with by the serving of a copy of such inventory upon each creditor, containing the cost price of each article and the amount to be paid under the proposed agreement of purchase.   This must be served personally or by registered mail five days before the sale. Again, what is the necessity of such a notice?   It can have but one purpose.   It gives to every creditor an inventory of

every article proposed to be sold, the cost price thereof and the amount that the purchaser proposed to pay, so that any creditor or a combination of creditors may step in within the five days allowed by the statute and bid a greater sum for the goods offered and thus defeat the sale contemplated and avoid the contract made between the seller and the purchaser, although they both may have acted in good faith and without any intention of defrauding creditors. It is doubtless true that there have been many sales of the goods of merchants made for the purpose of defrauding creditors, and that a statute imposing reasonable restrictions upon such sales ought to be enacted. But I think that the statute under consideration imposes an unnecessary and an unreasonable restriction upon the power of persons to contract, and that merchants could not in many instances comply with its requirements; and that it, in effect, prohibits parties from contracting for the purchase and sale of a stock of goods, even though both parties act in the best of faith and without any intention of defrauding creditors.

VANN, J. (dissenting). The only question presented by this appeal is whether the statute regulating the sale of merchandise in bulk (L. 1902, ch. 528) violates any provision of the State or Federal Constitution. The object of the act was to suppress a widespread evil, well known to current history and condemned by repeated adjudications in this court and in all the leading courts of the state from time out of mind. That evil is the tendency and practice of merchants who are heavily in debt to make secret sales of their merchandise in bulk for the purpose of defrauding creditors. Common observation shows that when a dealer has reached a point in his business career where he cannot go on owing to the claims of creditors, the temptation is strong and the practice common of making a fraudulent sale. Fraud works in secret, and the bargain is closed and the purchaser in possession before the creditors know anything about it. The evil is difficult for the courts to handle, because the evidence to uncover the fur-

tive scheme must, as a rule, be drawn from hostile witnesses, usually relatives or intimate friends of the seller, who took part in the fraud and shared in the plunder. All those who have had to do with the investigation of such transactions realize how well these frauds are protected by the forms of law and how frequently they are defended by perjury. The form of the fraud varies with the skill of the perpetrator and his advisers, but the unvarying purpose is to enable the debtor to hold and enjoy property which equitably belongs to his creditors. Inadequacy of consideration, absconding with the proceeds of the sale and the preference of fictitious claims are familiar methods. Many other means of holding on to property and concealing the facts are resorted to and it is not uncommon to see a dealer in possession of all that he had before he failed, and, acting under another name, carrying on the same business with the same stock, all unpaid for, in unblushing defiance of his creditors. Whatever the method of committing the fraud, its success depends on secrecy and perjury.

When a merchant owes more than he can pay he has no substantial equity in his stock of goods and the claims of his creditors are superior to his own. The courts may not only prevent him from parting with his property but may seize and sell it and apply the proceeds upon his debts. If an execution issued against his property is returned unsatisfied, he may be compelled to disclose under oath all his business transactions, tell what he has done with his estate, both real and personal, and the proceeds thereof, and if he still holds any property in the name of someone else, to divulge all the facts relating thereto. (Code Civ. Pro. §§ 2432, 2463.) He may be imprisoned on civil process and punished criminally for making a fraudulent disposition of his property and any person who is a party or privy to the fraud may be punished in the same way. (Code Civ. Pro. § 549 ; Penal Code, § 586.) Interference with his liberty and property by such methods has never been successfully questioned as a violation of fundamental rights. Many restraints upon freedom of contract, some of which reach back to our colonial history, have passed

without challenge, or if challenged have uniformly been sustained as valid. The Statute of Frauds, the act to prevent fraudulent conveyances, insolvent laws, the Recording Act, the prohibition of usury, lien laws, regulations in relation to chattel mortgages, conditional sales and preferences by corporations and in general assignments, show in how many ways and in what varied forms the legislature may properly restrain freedom of action in commercial transactions in order to promote the general welfare. Originally all parol contracts for the sale of personal property were valid and it was unnecessary to make delivery or payment wholly or in part. The Recording Act was unknown, and transfers in writing, whether absolute or conditional, did not have to be filed. Now, however, many statutes require business to be transacted in a certain way, and that constructive notice should be given in order to protect creditors and innocent purchasers. Such interference with liberty and such limitations upon the use of property, although arbitrary and inconvenient, have always been regarded as valid in order to prevent fraud and promote justice. While commerce is hampered to a limited extent in some ways it is protected and promoted to a much greater extent in other ways. The inconvenience of the restraint is less than the evil done away with.

The statute now before us was passed for the same general purpose as the most of those mentioned. It is aimed at the same evil which is admitted to be both serious and common. It does not prohibit a sale of any kind, but it provides safeguards against secrecy, which is the bulwark of fraud. It simply requires that notice of what is to be done should be given in advance, personally or by mail, to those directly interested who are frequently made the victims of fraudulent sales.

It regulates two kinds of sales: 1. A sale of any portion of a stock of merchandise other than in the ordinary course of trade in the regular and usual prosecution of the seller's business. 2. The sale of an entire stock of merchandise in bulk. We now have to deal with the latter only. Such a use is declared fraudulent and void, not absolutely but as

against the creditors of the seller unless the statute is com-
plied with.  If the seller pays his debts the sale stands even
if not made as required by the statute, but otherwise it falls
unless at least five days before the date thereof both seller and
purchaser unite in making a full and detailed inventory show-
ing the quantity and, so far as reasonable diligence will per-
mit, the cost price of each article.  This burden is cast upon
both seller and purchaser, but a further burden is placed on
the purchaser who is required at least five days before the sale
in good faith to make full and explicit inquiry of the seller as
to his creditors and the amount owing to each and to notify
them personally or by mail of the proposed sale, the cost
price of the stock to be sold and the price proposed to be paid.
At least five days before the sale the seller is commanded to
file, where is not specified but presumptively in the office where
a chattel mortgage given by him should be filed, a truthful
answer in writing to each inquiry made of him by the pur-
chaser as above required.  Except as thus specified the rules
of evidence and the presumptions of law are left unchanged.

A recent amendment provides that a sale " will be pre-
sumed to be fraudulent and void as against the creditors of
the seller " unless the statute is complied with, while the act
governing the case now before us makes such a sale absolutely
void as to creditors.  (L. 1904, ch. 569.)

The statute is confined to merchants and dealers, as is appa-
rent from the use of the expressions " a stock of merchandise "
and " the cost price to the seller."  No sale is forbidden, but
certain sales are regulated in order to prevent fraud.  No
restraint is placed upon sales made in the ordinary course of
business, whether at wholesale or retail, for the statute applies
only to unusual and extraordinary sales.  There is no attempt
to regulate sales generally, but merely those which experience
shows are so frequently made a cover for fraud.  There is no
interference with the ordinary business of merchants, but
when they sell their entire stock and go out of business, or
sell any substantial portion thereof in an irregular and unusual
way, notice to creditors is required so that they can protect

themselves against fraud. No protection is afforded to strangers, but simply to those who have a strong equitable right to see that the sale is for a fair price and free from fraud. If the merchant pays his debts there can be no attack upon the sale, however made. The act is less drastic than one imposing a lien upon goods sold until the purchase price is paid, with the right to discharge the lien by sales in the ordinary course of business, which is clearly within the power of the legislature. The requirement of notice is less burdensome than the imposition of a lien.

While the statute in question disturbs freedom of contract, so does fixing the price of elevating grain (*People* v. *Budd,* 117 N. Y. 1; *Munn* v. *Illinois,* 94 U. S. 113); the prohibition of options to buy or sell grain at a future time (*Booth* v. *Illinois,* 184 U. S. 425), and the annulment of all contracts for the sale of corporate stocks for future delivery, or on margin (*Otis* v. *Parker,* 187 U. S. 606). It interferes with the use of property, but so does a limitation upon the height of buildings (*People ex rel. Kemp* v. *D'Oench,* 111 N. Y. 359); the requirement that tenement houses shall be furnished with water (*Health Dept. of New York* v. *Rector, etc., Trinity Church,* 145 N. Y. 32); forbidding the sale of stamped bottles (*People* v. *Cannon,* 139 N. Y. 32); or of lottery tickets issued in a state where lotteries are lawful (*People* v. *Noelke,* 94 N. Y. 137); or of game purchased in another state as lawful merchandise and brought into this state (*People* v. *Bootman,* 180 N. Y. 1). It interferes with liberty, but so does the act " to regulate barbering on Sunday " (*People* v. *Havnor,* 149 N. Y. 195 ; *Petit* v. *Minnesota,* 177 U. S. 164); the statute making it a misdemeanor to exhibit a child as a dancer in order to earn a living (*People* v. *Ewer,* 141 N. Y. 129); the exclusion of children not vaccinated from school (*Matter of Viemeister,* 179 N. Y. 235), and the compulsory vaccination of all the inhabitants of a community (*Jacobson* v. *Mass.,* 197 U. S. 11).

Twenty states as well as the Federal government in the District of Columbia have similar statutes, some with provi-

sions more stringent than our own and all aimed at the suppression of an evil that is thus shown to be almost universal. (California, Civil Code, § 3440, as amended March 10th, 1903; Colorado, Laws 1903, ch. 110; Connecticut, Public Acts 1903, ch. 72; Delaware, Laws 1903, ch. 387; Dist. of Columbia, U. S. Statutes at Large, ch. 1809; 58th Cong. April 28th, 1904; Georgia, Laws 1903, No. 457; Idaho, Laws 1903, H. B. 18; Indiana, Acts 1903, ch. 153; Kentucky, Acts 1904, ch. 22; Louisiana, Acts 1896, No. 94; Maryland, Laws 1900, ch. 579; Massachusetts, Acts and Resolves 1903, ch. 415; Minnesota, General Laws 1899, ch. 291; Ohio, Laws 1902, H. B. 334; Oklahoma, Session Laws 1903, p. 249; Oregon, Billinger's Ann. Codes and Statutes, ch. 7; Tennessee, Acts 1901, ch. 133; Utah, Laws 1901, ch. 67; Virginia, Act approved January 2nd, 1904; Washington, Laws 1901, ch. 109; Wisconsin, Laws 1901, ch. 463.)

A statute with the same object attained by a similar remedy has been held valid by the highest courts in Massachusetts, Connecticut, Tennessee and Washington. (*J. P. Squire & Co.* v. *Tellier*, 185 Mass. 18; *Walp* v. *Mooar*, 76 Conn. 515; *Neas* v. *Borches*, 109 Tenn. 398; *McDaniels* v. *J. J. Connelly Shoe Co.*, 30 Wash. 549.) An act declaring such sales presumptively fraudulent was assumed to be valid by the courts of last resort in Wisconsin and Maryland. (*Fisher* v. *Herrmann*, 118 Wis. 424; *Hart* v. *Roney*, 93 Md. 432.)

On the other hand, a statute with more exacting conditions was held unconstitutional in Ohio (*Miller* v. *Crawford*, 70 Ohio St. 207), and a similar act met the same fate in Utah, where a violation of the statute was made a crime (*Block* v. *Schwartz*, 27 Utah, 387). The weight of authority, thus far announced, is in favor of the validity of such legislation. The general grounds upon which it has been sustained are well illustrated by the following extract from the opinion of the Supreme Court of Massachusetts: " A purchaser, to be safe, has only to see that the vendor's creditors are provided for. The vendor may sell freely, without regard to the statute, if he pays his debts. The legislature, when contemplating this

legislation, had occasion to consider and balance against each other the general right of property owners to make contracts and dispose of their property, and the general right of creditors to be paid, and to have reasonable opportunities secured to them for the collection of their debts. That this is within a class of legislation for which there is constitutional authority is too plain for question. The object of it is like that of our numerous statutory provisions which authorize attachments on mesne process, and establish courts with all the necessary machinery for the collection of debts. The statute requires of the vendor nothing that cannot be done with reasonable effort. If he is unable or unwilling to pay his debts, it puts a substantial obstacle in his way when he wants to dispose of his stock of merchandise in bulk and to receive payment for himself. But, under such circumstances, the property in most cases ought not to be sold in bulk without first giving creditors an opportunity to consider what ought to be done with it." (*J. P. Squire & Co.* v. *Tellier,* 185 Mass. 18, 20.)

The question before us is one of power, not of policy. Courts may pass upon the power of the legislature, but not upon its policy. Statutes, whether wise or unwise, are equally binding upon us, provided no provision of either Constitution is molested. According to the general rule, unless there is a plain conflict between a statute and the Constitution, the statute stands, for every presumption is in its favor. The respect due to a co-ordinate branch of the government will not permit mere judicial doubt to undermine a statute, for there must be clear judicial conviction that it violates the Constitution before the courts can set it aside. The legislature with all the power of legislation there is, may pass any law upon any subject, unless it is expressly or impliedly forbidden by the supreme law of the State or of the United States. There is a power beneath the Constitution but not superior to it, unwritten, not fully defined, necessary, resting on the sovereignty of the state, which exists because the state cannot exist without it and which must be considered in connection with the Constitution. That power, known as the police

power, aims to promote the public welfare by compulsion and restraint and it is under the exclusive control of the legislature. The executive department can exert it only as authorized by the legislature. The courts can neither exercise it, nor prevent its exercise, but they can determine whether a statute is a constitutional use of the power. We cannot overturn a statute because we do not like it, for our likes and dislikes affect us as citizens, not as judges. We greatly prefer the amended act to the original, because although effective it is not so harsh, but that has nothing to do with the validity of either.

Starting always with the presumption that the statute, although challenged, is valid, we study it in connection with the Constitution to see whether there is such a conflict as to divest the legislature of jurisdiction. If purporting to be passed in the exercise of the police power, we endeavor to see, *first*, whether there was an evil to be remedied, and, *second*, whether the remedy prescribed is "calculated, intended, convenient or appropriate" to suppress it and not designed to trespass upon personal rights "under the guise of a police regulation." If "the act has a fair, just and reasonable relation to the general welfare," it may so regulate "the conduct of an individual and the use of property" as to "interfere to some extent with the freedom of the one and the enjoyment of the other." If it violates no express command of the Constitution and tends "in a degree that is perceptible and clear towards the preservation of the lives, the health, the morals or the welfare of the community, as those words have been used and construed in many cases heretofore decided," and is not passed "ostensibly in favor of the promotion of some such object, while really it is an evasion thereof and for a distinct and totally different purpose," it comes within the jurisdiction of the legislature and the courts are bound to sustain it. The police power cannot be arbitrarily exercised so as to deprive the citizen of his liberty or property, "but a statute does not work such a deprivation in the constitutional sense, simply because it imposes burdens or abridges freedom of action, or regulates occupations. or subjects indi-

23

viduals or property to restraints in matters indifferent, except as they affect public interests or the rights of others. Legislation under the police power infringes the constitutional guaranty only when it is extended to subjects not within its scope and purview, as that power was defined and understood when the Constitution was adopted."

Liberty under the Constitution does not mean natural liberty, or the right to act as one pleases subject only to the laws of nature, for society cannot exist on that basis. Constitutional liberty is the right to act without restraint upon person or property, except such as is necessary or expedient for the general advantage of the public. (*Matter of Jacobs*, 98 N. Y. 98; *People* v. *Marx*, 99 N. Y. 377; *People* v. *Arensberg*, 105 N. Y. 123; *People* v. *Gillson*, 109 N. Y. 389; *People* v. *Budd*, 117 N. Y. 1; *Health Dept. of New York* v. *Rector, etc., Trinity Church*, 145 N. Y. 32; *Slaughter House Cases*, 16 Wall. 36; *Barbier* v. *Connolly*, 113 U. S. 27; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650.)

The legislation under consideration was intended to suppress a deep-seated evil, common in sales of a certain kind. The existence of the evil is admitted, and the right of the legislature to provide a remedy is also admitted, but it is insisted that the remedy provided is so unreasonable that it violates the primary guaranties of the Constitution. The same claim was made when a maximum price was fixed for doing a certain kind of work, but it was rejected, because the work was done in a business affected with a public interest. (*People* v. *Budd, supra*.) The same position was taken when one state absolutely prohibited sales on margin and another options to buy or sell at a future time, contracts which were previously valid, but both provisions were sustained by the Supreme Court of the United States, because they tended to prevent gambling. (*Booth* v. *Illinois, supra*, and *Otis* v. *Parker, supra*.) While many contracts of the kind prohibited were free from wrong, as so many were made for the purpose of gambling, all were swept away, the good and the bad alike. Is gambling a worse evil than fraud? Does it

affect commerce more seriously? Is freedom of contract interfered with more by requiring notice to creditors before certain sales are made, than by forbidding certain other sales altogether? The statute is intended to interfere only with those who buy and sell in bad faith toward the creditors of the vendor. It doubtless interferes with some who act in good faith, but so do the other statutes referred to. In order to prevent injustice and fraud, legislation for time out of mind has placed some restraint upon commercial transactions, and where the legislature has jurisdiction to act the method of suppressing the evil is wholly within its sound discretion.

The right to pass laws to prevent fraud being conceded, what principle is to guide us in drawing a line to separate the act before us from those considered in the cases cited? How can we declare this statute void and the others valid? It has no ulterior purpose. No attempt is made to protect some favored interest from injurious competition. Its object is not, as in the *Gillson* case, to interfere with a lawful business, but to prevent one man from keeping property which equitably belongs to others. It seeks to maintain justice, which is one of the leading features of the public welfare. The protection of creditors has always been a primary function in the administration of justice. Why should the Constitution require courts to be maintained to punish fraud and yet deprive the legislature of power to prevent fraud by requiring notice to a class apt to be defrauded?

As it is known that dishonest merchants abuse freedom of contract by secretly selling out in such a way as to defeat the claims of creditors, may not the legislature surround the right with some safeguards, such as an inventory and notice thereof? When the end sought is within the domain of legislation and the form of the remedy proposed is fairly adapted to that end, the courts have no power to interfere. When jurisdiction exists, the details are within the exclusive control of the legislature. While a merchant, owing debts, has an absolute constitutional right to sell his stock of goods, he may properly be required to do something for the protection of his creditors

and what he shall do is for the legislature to prescribe. With power to act upon the subject it may pass a foolish statute or a wise one, and we cannot overturn the one unless we can the other. It is only when there is a want of power to legislate that the courts can declare a statute void.

It is insisted, and the argument is not without force, that while the provisions of the act, so far as they relate to the vendor, may be valid, the restraint upon the purchaser is so severe as to impinge on the right of liberty and property. What is required of the purchaser? To some extent he must look after the interests of creditors, if there are any. He must either see that they are paid or notify them in advance of what is to be sold, the price paid and to be paid and must ask the seller who his creditors are. If there are no creditors the statute does not apply. If the inquiry, when carefully made, discloses no creditors and the purchaser knows of none, he may buy in safety without the inconvenience of inventory or notice. If there are creditors, the risk is in proportion to the amount of their claims, and whether it is large or small, they have rights which need protection from a sale made in bad faith and it is at such sales that the statute strikes. The purchaser may be buying property in which the seller has less real interest than his creditors, and it is reasonable to charge both seller and purchaser with the exercise of some care toward them, in the interest of justice and the general welfare. The inconvenience to purchasers is an evil, as it hampers commerce to some extent, but the injury to commerce from fraudulent sales is a much greater evil, so that on the whole commerce is not harmed but helped. The legislature had the right to balance these evils and to promote the common good by trying to do away with the greater. The everyday business of the seller and buyer is not touched, for that is outside of the statute, but when an extraordinary sale is made, such as can occur but few times in the life of a merchant, certain conditions and restraints are imposed, not to hamper business, but to prevent secret sales in bulk of property usually bought on credit and generally unpaid for when the sale is

made. The remedy provided tends to furnish the protection needed by creditors without any interference whatever with ordinary business and without disturbing freedom of contract in the rare and irregular cases to which the act applies any more than was within the power of the legislature according to the principles laid down by repeated adjudications in this court and in the Supreme Court of the United States.

Purchasers who complain of the act as a violation of their constitutional rights are themselves protected by legislation equally drastic, for they could not purchase in safety were it not for the acts in relation to chattel mortgages and conditional sales. They might purchase and pay in good faith and yet have the property taken away from them under a lien they knew nothing about and which they could not discover. As the legislature passed these acts, it can repeal them and in that event purchasers, however careful, might not get a good title, while now, even with the act under consideration in full force, they can get a good title if they only take pains. They cannot, therefore, consistently object to such a statute. They cannot in fairness assert that interference with an unlimited right of contract is constitutional when it operates in their favor, but unconstitutional when it operates in favor of creditors and against themselves.

It is also claimed that an unreasonable burden is imposed upon a limited class of debtors for the benefit of a limited class consisting of their creditors. A statute which is uniform in its effect upon all persons to whom it applies is not invalid because it applies to a limited number. This act applies to all the people of the State who carry on a certain kind of business, which presents special temptations and opportunities for the commission of fraud. The classification is not arbitrary, but is founded on a "reasonable and just difference between the persons affected and all others." The difference is seen in the nature of a business conducted largely on credit, which, as shown by the records of our courts, furnishes peculiar facilities for the perpetration of a characteristic fraud. As was said by Mr. Justice BREWER in a late case: "It is

within the undoubted power of the Government to restrain some individuals from all contracts as well as all individuals from some contracts " (*Frisbie* v. *U. S.*, 157 U. S. 160, 165), and by Mr. Justice Fields in an earlier case : " Special burdens are often necessary for general benefits.   *   *   *   Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions." (*Barbier* v. *Connolly*, 113 U. S. 27, 31.) " The discriminations which are open to objection are those where persons engaged in the same business are subjected to different restrictions or are held entitled to different privileges under the same conditions." (*Soon Hing* v. *Crowley*, 113 U. S. 703, 709.) The Constitution means " that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." (*Missouri* v. *Lewis*, 101 U. S. 22; *Moore* v. *Missouri*, 159 U. S. 673, 678.)

I close my review by repeating as applicable generally to the case before us the words of the Supreme Court of the United States in a decision of great importance : " The power which the legislature has to promote the general welfare is very great and the discretion which that department of the government has, in the employment of means to that end, is very large. While both its power and its discretion must be so exercised as not to impair the fundamental rights of life, liberty and property   *   *   *   yet in many cases of mere administration the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment exercised either in the pressure of public opinion or by means of the suffrage." (*Powell* v. *Penn.*, 127 U. S. 678, 685, citing *Yick Wo* v. *Hopkins*, 118 U. S. 370.)

The judgment should be affirmed, with costs, and the question certified answered in the affirmative.

CULLEN, Ch. J. (dissenting).   I concur entirely in the opinion of my brother VANN, but as the point has now been raised that the statute before us makes unlawful discrimination between sales of one kind of personal property and sales of other personal property, of sales by persons engaged in one character of business and those in another, and, therefore, violates the provision of the Federal Constitution guaranteeing equal protection of the laws, I desire to add a word.

Of course, absolutely arbitrary selection by the legislature in imposing a tax or in creating a crime cannot be justified, and for this reason we refused to uphold the imposition of a transfer tax in the *Pell Case* (171 N. Y. 48).   But if there be difference in circumstance which bears some reasonable relation to the classification made by a statute then that statute must be upheld, however greatly we may doubt its wisdom.   Ever since we adopted the Law Merchant there has been a difference in the title acquired by a *bona fide* purchaser to different kinds of personal property.   The purchaser of a watch or of a bond and mortgage must abide the title of his vendor, though he purchases in the best of faith for a full consideration.   But the purchaser of a railroad bond or a promissory note, if he acts in good faith, acquires title to the security even though he buys from a thief.   The practical difference between the business of a merchant and that of a farmer is very apparent.   A merchant obtains credit on the capital which he has in his business, that is to say, the excess in value of his stock in trade over his debts.   He cannot secure his creditors by a mortgage on his goods, for a chattel mortgage on a fluctuating stock is void as against a purchaser, and to uphold such a mortgage would destroy the very object for which the goods are sold to a merchant, to wit, for sale to his customers.   The case of a farmer is radically different.   His capital is principally represented by his land, his stock, his implements, which are the subject of mortgage or

lien, and any credit extended to him is accorded far more to his fixed capital than to his expected crops. It is unnecessary, however, to pursue the discussion. Every business man will appreciate a score of distinctions between the way business is carried on by the one class and by the other. The doctrine contended for, that legislation must be exactly uniform, would be fatal to a large part of the statutory law of this state which has never been challenged and under which the community has lived for many years. Take as a single example the Transfer Tax Law. Religious corporations are exempt from the tax, other charitable corporations not, as we have held. But more than that, a legacy or devise to a bishop is exempt, but there is no exemption in favor of any other minister or clergyman. Our law abounds in similar distinctions, many of which we may think without justification, but the power of the legislature to make those distinctions has not been challenged. Without continuing the argument, however, it seems to me that the recent action of this court in the race course gambling cases is conclusive. We have twice upheld, by a unanimous court, the validity of legislation which makes certain gambling on horse races outside of the track a felony, punishable by imprisonment in state's prison for not more than two years, while the same act, if committed on the race grounds, is not a crime at all, but subjects the offender only to repayment of the money he has received on the bet. Be the distinction little or great between the conduct of business by merchants engaged in selling goods and that carried on by other owners of personal property, who, to use the judicial expression of the day, will have the temerity to deny that such difference is infinitely greater than that which obtains, either in moral obliquity or in injury to the community, between gambling inside the fence which surrounds a race track and gambling outside that fence?

GRAY and BARTLETT, JJ., concur with WERNER and HAIGHT, JJ.; CULLEN, Ch. J. (in memorandum), and O'BRIEN, J., concur with VANN, J.

Judgment reversed, etc.