(110 App. Div. 821.)

PEOPLE ex rel. HATCH v. REARDON, Peace Officer.

(Supreme Court, Appellate Division, First Department. January 26, 1906.)

1. STATUTES—FORMALITIES OF ENACTMENT—DISTRIBUTION OF PRINTED BILLS.

Const. art. 3, § 15, providing that no bill shall be passed unless it shall have been printed and upon the desk of the members in its final form, at least three calendar legislative days prior to its final passage, is sufficiently complied with where a bill originating in one house is printed and placed on the desk of each member of both houses and every amendment made thereto, as printed and placed upon the desks of the members of the house in which the bill originated, is also printed and placed upon the desk of each member of the other house, so that the bill in its final form is upon the desk of each member of each house of the assembly for at least three legislative days prior to its final passage.

2. SAME—PRESUMPTIONS IN FAVOR OF VALIDITY.

There is a presumption in favor of the validity of a statute, and the courts may not declare it void unless, beyond a reasonable doubt, it has been enacted in violation of a controlling constitutional provision.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Statutes, § 56.]

3. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—TRANSFER TAX ACTS.

Tax Law, Laws 1905, pp. 474–477, c. 241, §§ 315–324, imposing a tax on transfers of stock in domestic or foreign corporations, is not repugnant to Const. art. 1, § 6, providing that no person shall be deprived of property without due process of law.

4. SAME—EQUAL PROTECTION OF LAWS.

Tax Law, Laws 1905, pp. 474–477, c. 241, §§ 315–324, imposing a tax on transfers of stock in domestic or foreign corporations, does not deny to any person within the state the equal protection of the laws within the prohibition of Const. U. S. Amend. 14.

5. TAXATION—TRANSFER TAXES—CONSTITUTIONALITY.

Tax Law, Laws 1905, pp. 474–477, c. 241, §§ 315–324, imposing a tax on transfers of stock in domestic or foreign corporations, is valid as a transfer tax conceding that it could not be sustained as a property tax, because not based on value, and because it affords the taxpayer no opportunity for a hearing on the valuation of his property and the amount of the tax.

6. SAME.

Tax Law, Laws 1905, pp. 474–477, c. 241, §§ 315–324, imposing a tax on transfers of stock in domestic or foreign corporations, is uniform in its operation, moderate in its exactions, and its selection of transfers of corporation stock as a subject of taxation is not arbitrary.

7. COMMERCE—INTERSTATE COMMERCE—INTERFERENCE BY STATES—TAXATION OF STOCK TRANSFERS.

Tax Law, Laws 1905, pp. 474–477, c. 241, §§ 315–324, imposing a tax on transfers of stock in domestic or foreign corporations, applies only to transfers made within the state, and is not in conflict with Const. U. S. art. 1, § 8, empowering Congress to regulate interstate commerce.

8. TAXATION—TRANSFER TAXES—JURISDICTION TO ASSESS.

Tax Law, Laws 1905, pp. 474–477, c. 241, §§ 315–324, imposing a tax on transfers of stock in domestic or foreign corporations, does not, in that it imposes a tax on transfers of the stock of a foreign corporation owned by a nonresident, tax property without the jurisdiction of the state, but the transfer being made within the state confers jurisdiction to impose the tax thereon.

Ingraham, J., dissenting.

Appeal from Special Term, New York County.

Habeas corpus proceedings by the people, on the relation of Albert

J. Hatch, against Edward Reardon, a peace officer of the county of New York. From an order dismissing the writ, and remanding relator to custody, relator appeals. Affirmed.

' The relator was arrested on the 8th day of June, 1905, on a warrant issued by a justice of the Court of Special Sessions, First Division, of the city of New York, charging him with having committed a misdemeanor the day before by selling and delivering certain shares of the capital stock of certain railroad companies in the county of New York without making a bill or memorandum of the sale or affixing thereto a stamp or in any manner paying the tax required by the provisions of article 15 of the tax law added by chapter 241, p. 474, of the Laws of 1905. The information upon which the warrant was issued was filed by the purchaser of the stocks who was a resident of Connecticut, but had an office for the transaction of business in the borough of Manhattan, N. Y. It showed that the relator also resided in the state of Connecticut; that on the 7th day of June, 1905, the relator sold and delivered to the complainant in said borough of Manhattan a certificate, assigned in blank, of 100 shares of the capital stock of the Southern Railway Company, a Virginia corporation, owning and operating a railway wholly without the state of New York, of the par value of $100 per share, at $30.75 per share, that being the market value thereof, and also a certificate, assigned in blank, of 100 shares of the capital stock of the Chicago, Milwaukee & St. Paul Railroad Company, a Wisconsin corporation, likewise owning and operating a railroad wholly without the state of New York, of the par value of $100 per share, at $172 per share, that being the par value thereof, without making or delivering to the purchaser a bill or memorandum of sale or affixing any stamp or stamps, and without paying any tax, although requested so to do. After the relator was arrested he sued out the writ of habeas corpus and demanded his discharge, upon the ground that the provisions of said article 15 of the tax law are unconstitutional, and void.

Argued before O'BRIEN, P. J., and McLAUGHLIN, INGRAHAM, LAUGHLIN, and HOUGHTON, JJ.

John G. Milburn (John F. Dillon, on the brief), for relator.
William Travers Jerome, Dist. Atty. (E. Crosby Kindelberger and Howard S. Gans, on the brief), for respondent.
Julius F. Mayer, Atty. Gen. (John R. Dos Passos, on the brief), for the People.

LAUGHLIN, J. The instructive arguments and excellent briefs of the learned counsel on this appeal have enabled the court to readily appreciate the present status of judicial decisions on the interesting questions presented, and the points on which the validity of the stock transfer stamp tax law, so called, hinges. The validity of the amendment to the tax law is challenged upon the ground, among others, that the bill had only been upon the desks of the members of Assembly one day prior to its passage in that body. This objection should be considered first, because, if the constitutional requirements for the enactment of statutory law have not been observed, it is needless to inquire whether it would be competent for the Legislature to enact such legislation, and the discussion of the question would be obiter. The bill as printed in the session laws shows that it was duly enacted. The original certificates annexed to the act and on file with the Secretary of State are not presented by the record. It is not contended that they are not in due form to show the proper enactment of the law. It is contended that the journals may not be consulted to impeach the law. I am of opinion, however, that they do not impeach it; and I prefer

to put the decision upon that ground without deciding whether if they did, they would be competent for that purpose.

Section 15 of article 3 of the State Constitution provides that:

"No bill shall be passed or become a law unless it shall have been printed and upon the desk of the members, in its final form, at least three calendar legislative days prior to its final passage unless the Governor, or the acting Governor, shall have certified to the necessity of its immediate passage, under his hand and the seal of the state; nor shall any bill be passed or become a law, except by the assent of a majority of the members elected to each branch of the Legislature; and upon the last reading of a bill, no amendment thereof shall be allowed, and the question upon its final passage shall be taken immediately thereafter, and the yeas and nays entered on the journal."

The provision requiring that the printed bill in the form in which it is to be enacted shall be upon the desks of the members three calendar legislative days is new, having been first adopted in 1904. The petition upon which the writ was granted shows that this bill originated in the Senate and had been printed and upon the desks of the members of that body in its final form the requisite time before its passage, which was on the 3d day of April, 1905; that on the next day, it was duly sent to the Assembly for concurrence and had its first reading in that body on that day and was duly referred to the Assembly committee on taxation and retrenchment, which committee reported the same day in favor of its passage without amendment; that this report was thereupon agreed to and the bill was placed upon the order of second reading and had its second and third readings and passed on the 5th day of April by the requisite vote and in the presence of the quorum required by the Constitution; that pursuant to a practice adopted by the Senate and Assembly, without the enactment of a statute or rule requiring it, with a view to complying with the requirements of said section 15 of article 3 of the Constitution, a bill originating in one house was printed and placed on the desk of each member of the other, and every amendment made thereto as printed and placed upon the desks of the members of the house in which the bill originated, was likewise printed and placed upon the desk of each member of the other house; that pursuant to this practice the bill in question had been printed and upon the desk of each member of the Assembly in the final form in which it was passed for more than three days. This was clearly a literal compliance with the constitutional requirements; and I am of opinion that it was a compliance with the spirit and intent thereof. The abuses that led to the adoption of this provision of the Constitution are well known. In committee and on the final passage of bills important amendments for ulterior purposes were sometimes surreptitiously made in writing or typewriting, and often allowed in that form without being thoroughly understood; and thus bills were passed not only without being understood, but without either publicity or deliberation. Under the practice adopted by the Legislature for the purpose of complying with the Constitution none of the former abuses can be revived. When this bill came over from the Senate, every member of the Assembly had notice that it was the bill that was printed and upon his desk, and had been in the form in which it was passed by the Senate for the requisite time. This had given him ample opportunity to become familiar with the bill, and no deception

could be practiced upon him or upon his constituents. The publicity by its pendency in the Senate and remaining there in its final form three days before its passage, was all the notice to the constituents of members designed to be given. The debates in the Constitutional Convention indicate that this was the view of Senator Vedder, an experienced legislator and the author of this provision, as shown by the following colloquy between Delegate Foote and himself immediately before the adoption of the amendment:

"Mr. Foote: Mr. President, I desire to enquire of the chairman of the committee of the legislative powers and duties, whether his understanding of this amendment is that the bill must have been printed and upon the desks of the members in each of the Houses three days before its passage in each House, or whether the provision means that three days before the final passage in the last House it must have been printed and upon the desks of all the members of the other House?

"Mr. Vedder: Mr. President, the question of the gentleman suggests that he may not be accustomed to the rules of legislative bodies. When a Senate bill is printed it is put upon the Senate files of the Assembly, precisely the same as it is in the Senate, and vice versa. This means that it must be upon the desks of the members of the House which votes upon it three legislative days before that House votes upon it, so that they may read it and understand it. That is the object of the amendment. From necessity, it is also in the other House at the same time, because they always go together."

Revised Records Cons. Conv. 1894, vol. 1, p. 916.

The learned counsel for appellant do not contend that the bill should have been reprinted after coming over to the Assembly. They concede that the printing was sufficient, but they maintain that three days must in every instance elapse after the particular body has obtained jurisdiction of the bill, either by its having been introduced in its own body, if the question be upon the passage of its own bill, three or more days before, or by its having been sent over from the other body three or more days before final passage. There is room for this contention and force in the arguments persuasively presented; and yet to so hold would probably invalidate a large part of the legislation enacted during the last 11 years. I think the Constitution is susceptible of the construction that has been placed upon it by the Senate and Assembly. The abuses at which the provision was aimed cannot arise under the practice in vogue; and I think it should not be overthrown by the courts. It is well known that the members of each legislative body keep advised concerning the important measures pending in the other, its members often attending the hearings before the committees of the other house. After a bill like this has first received careful consideration by one body with public hearings of interested parties before its committee and is then duly passed and has been in the final form of its passage printed and upon the desks of the members of the other body for three days or more, no harm can come from permitting it to be put upon final passage as soon as a majority so directs. Often the members of one body are watching the hearings upon bills pending in the other and ready to vote as soon as the bill comes over; and it not infrequently happens that the early enactment of a bill after passing one body is required for the public interests. If this had been an Assembly bill and on the desks of the members the length of time it was, concededly that body could have legally passed it at

the time it passed the Senate bill. If so, why was it not competent for it to adopt the Senate bill? Frequently the same bill is introduced in each house and is ready for final passage about the same time. The arguments of the learned counsel for the appellant lead logically to the position that in such case, although the bills are the same, and each house is ready to pass its own, it cannot, until the lapse of three days, concur in the one which originated in and passed the other body. To require a certificate of the Governor or acting Governor in such cases would not compel further deliberation; and would only add another cumbersome and technical requirement, upon the due compliance with which would depend the validity of the law. Having, for these reasons, reached the conclusion that the procedure was sufficiently regular to validate the bill, provided it was competent for the Legislature to enact it, it becomes necessary to examine its provisions in the light of the objections to their constitutionality.

Article 15, added to the tax law by the amendment, contains 10 sections, 315 to 324 inclusive. Laws 1905, pp. 474–477, c. 241. Section 315, so far as material to a decision of the questions presented, imposes a tax "on all sales, or agreements to sell, or memoranda of sales or deliveries or transfer of shares or certificates of stock in any domestic or foreign association, company or corporation, made after the first day of June, 1905, whether made upon or shown by the books of the association, company or corporation, or by any assignment in blank, or by any delivery, or by any proper agreement or memorandum or other evidence of transfer or sale whether entitling the holder in any manner to the benefit of such stock; or to secure the future payment of money or the future transfer of any stock, on each $100 of face value or fraction thereof, 2 cents. It is not intended by this act to impose a tax upon an agreement evidencing the deposit of stock certificates as collateral security for money loaned thereon which stock certificates are not actually sold, nor upon such stock certificates so deposited." The section then prescribes how the payment of the tax shall be denoted; and with respect to sales of certificates assigned in blank and delivered, as these were, it provides that the seller shall make and deliver to the buyer a memorandum or bill of sale, showing the date and amount of the sale and the name of the seller, to which an adhesive stamp or stamps prescribed in the act shall be affixed showing the payment of the tax. Sections 316 and 319 authorize and require the Comptroller of the state to prepare the stamps, and put them on sale at convenient places. Section 317 provides in substance that a person who shall make a sale without paying the tax, or who shall deliver any stock or evidence of the sale thereof without affixing the stamps as required by the state shall be guilty of a misdemeanor and upon conviction thereof shall pay a fine of not less than $500 nor more than $1,000, or be imprisoned for not more than six months or shall be subjected to "both such fine and imprisonment at the discretion of the court." Section 322 prescribes an additional civil penalty to the state of $500 for each violation of the act to be collected by the comptroller. Section 318 requires the seller to cancel the stamps as therein prescribed and makes a failure to comply therewith a misdemeanor. Section 320 makes an illegal use or interference with the stamps a misdemeanor.

Section 321 confers authority upon the comptroller to inquire into the payment of such tax and to enforce payment thereof by action. Section 323 provides, in substance, that no transfer of stock in violation of the provisions of the article "shall be made the basis of any action or legal proceeding nor shall proof thereof be offered or received in evidence in any court of the state." Section 324 provides that these taxes when collected by the comptroller shall be paid "into the state treasury and be applicable to the general fund, and to the payment of all claims and demands which are a lawful charge thereon."

The provisions of the amendment to the tax law clearly show that the stamp tax on the transfer of stocks was intended as a substantial source of general revenue. The language employed embraces every actual sale and delivery of stock anywhere within the state. Yet it is well known that the sale of such securities elsewhere than on the exchanges or on the "curb" is only a very small percentage. The extent of the transactions in stocks on the exchanges is a matter of record; and the legislators could estimate approximately the revenue that might be derived from this stamp tax. It is a matter of current history that it was expected that about $5,000,000 per annum would flow into the state treasury from the imposition of the tax, and that the amount of such taxes thus far collected indicates that the total for the year will approximate the amount anticipated. In approaching the momentous questions presented, it must be borne in mind that the power of taxation is an essential attribute of government, that subject to constitutional restraints it is for the Legislature, representing the people, to determine the subjects and objects of taxation; that the Legislature is vested with all the power reserved to the people and, except as it may be expressly or impliedly restrained by the state or federal Constitution has unlimited power in the premises. Judges, therefore, may neither substitute their own judgment for that of the Legislature as to the wishes or justice of a particular law, nor be influenced by those or like considerations in deciding its constitutionality. The sole enquiry is, therefore, has the Legislature exceeded its jurisdiction and enacted a tax measure in contravention of the state or national Constitution? The presumption is in favor of the validity of the statute and we may not declare it void unless beyond a reasonable doubt it has been enacted in violation of a controlling constitutional provision. There is no express limitation in our state Constitution on the taxing power of the Legislature. Section 15 of article 3 prescribes the vote essential to the passage of a bill; and section 25 of the same article prescribes that the presence of three-fifths of all the members elected to each house shall be essential to constitute a quorum for the passage of bills, among others, imposing a tax. These provisions were complied with. The only provision of the state Constitution relied on by the relator is section 6 of article 1 which provides that:

"No person * * * shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation."

The appellant also relies on the fourteenth article of amendment to the federal Constitution which provides, among other things, that:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

This provision was undoubtedly designed to restrain legislation by the states and not by Congress; but a similar provision, excepting the clause with respect to the equal protection of the laws, is contained in the fifth article of amendment as a restraint upon the legislative power of Congress. This law does not deprive people within the state of New York of equal protection of the laws. It operates on all who sell stock in any part of the state alike regardless of creed, color, or nativity; and the amount of the tax depends upon the magnitude of the transaction. It is imposed on the transfers of a distinct class of property most extensively bought and sold on the exchanges. It does not, therefore, I think deny to any person within the state the equal protection of the laws; and is not within the prohibition of the clause of the federal constitution relating to equal protection of laws. It cannot be successfully maintained that the federal government has any greater power of taxation, except with respect to imports, which the states are prohibited from taxing (article 1, §§ 8–10, Const. U. S.), than the state. It was never intended that Congress should have power to enact a tax measure depriving any person of the equal protection of the laws in the sense in which the states are inhibited from making laws depriving him of such protection. It follows, therefore, I think, logically that if Congress could impose such a tax, the state may likewise. This tax measure follows in all material respects section 6 of the United States revenue tax law of 1898 (Act July 13, 1898, c. 448, 30 Stat. 451 [U. S. Comp. St. 1901, p. 2291]), and was doubtless founded thereon. In United States v. Thomas (C. C.) 115 Fed. 207, affirmed 192 U. S. 363, 24 Sup. Ct. 305, 48 L. Ed. 481, all of the objections now urged against the state law, at least, with the exception of the equal protection clause of the fourteenth amendment, appear to have been presented against the validity of the federal law; and they were fully and ably answered and it was sustained as a tax, not upon property, but upon the transfer of this particular species of property. If it was competent for Congress to enact that law, it was competent for the Legislature of New York to enact this statute. It may be that under the decisions of our own courts as a tax on property this statute could not be sustained owing to the fact that it is not based on value and that no opportunity is afforded the person upon whom the tax is imposed for a hearing on the valuation of his property or the amount of the tax, objections forcibly presented by Mr. Justice Ingraham. I disagree with him, however, as to the nature of this tax. The learned Attorney General and his associate do not seek to sustain the law as a tax upon property. They contend that it is an excise tax or stamp duty upon the transaction or transfer of certificates of stock, the amount of the tax depending upon the extent of the business; and such literally it appears to be.

It has so long been the practice in this state to tax property only that the validity of any legislation departing from that practice is vigorously contested. The fact that the power has not been here-

tofore exercised is no evidence that it does not exist. Of late years
the Legislature has imposed a tax in certain instances on the transfer
of property by will and under the intestacy laws; and its authority in
this regard has been sustained both by the state and federal courts, al-
though the tax was not imposed on all such transfers and varied with
the valuation of the property transferred. The Legislature has also
inaugurated a policy of taxing special franchises, a species of intangi-
ble property not theretofore reached under the tax laws. The validity
of these laws has also been sustained by the Court of Appeals and
by the Supreme Court of the United States. From these two sources
and from the liquor tax most of the revenues essential to maintain the
state are now derived. Our courts and the federal courts have fre-
quently given expression to the view that it is competent for the Legis-
lature to single out any species of property or business or the transfer
of property, as the object of taxation. People v. Home Ins. Co., 92 N.
Y. 337; Matter of McPherson, 104 N. Y. 317, 10 N. E. 685, 58 Am.
Rep. 502; Matter of Whiting's Estate, 150 N. Y. 29, 44 N. E. 715, 34
L. R. A. 232, 55 Am. St. Rep. 640; Cook v. Marshall County, 196 U. S.
261, 25 Sup. Ct. 233, 49 L. Ed. 471; Matter of Gould's Estate, 156 N.
Y. 427, 51 N. E. 287; Magoun v. Illinois Trust & Savings Bank, 170
U. S. 293, 18 Sup. Ct. 594, 42 L. Ed. 1037; Nicol v. Ames, 173 U. S.
509, 19 Sup. Ct. 522, 43 L. Ed. 786. The contention of the relator
carried to its logical effect would confine the Legislature in exercising
the power of taxation to an ad valorem tax on all personal property
or all real property or both. It is not so confined by any constitutional
provision or by the decisions of the courts rendered heretofore. There
are doubtless implied limitations on the exercise of this taxing power.
If the Legislature should capriciously single out a particular species
of property or even the transfer thereof for taxation, without any
reasonable ground for the classification, or hostilely discriminate against
particular persons or classes, and impose a tax thereon which would
practically constitute confiscation or be oppressive, the legislation
might be declared void. Matter of Pell's Estate, 171 N. Y. 48, 63
N. E. 789, 57 L. R. A. 540, 89 Am. St. Rep. 791; People v. Eq. Trust
Co., 96 N. Y. 387; Connolly v. Union Sewer Pipe Co., 184 U. S. 540,
22 Sup. Ct. 431, 46 L. Ed. 679; Nicol v. Ames, supra. The statute
under consideration, however, cannot fairly be condemned on this
ground. It is uniform, it is moderate, and the transactions singled out
embrace in the value of the property and the number of transfers by
far the most important sales of property within the state. The measure
is practicable of enforcement and will produce a great revenue without
being ever burdensome on the sellers or oppressive. The classification
is not arbitrary. The property upon the transfer of which the tax is
levied is the product of legislation. It stands out by itself as a dis-
tinct class of property.

Whether under the reserved power to alter, amend and repeal char-
ters of corporations the Legislature could impose this tax on the trans-
fer of stock of domestic corporations theretofore incorporated need not
be decided; but it is very clear that as to new corporations it could
impose it even though it could not on the transfer of notes, bonds, and
mortgages of individuals. Since the Legislature determined to in-

augurate the policy which clearly it was competent for it to inaugurate as to some property of the class, is it not equitable that the transfer of stock in foreign corporations on the exchanges in this state should be put on a par with stock in a domestic corporation? The decisions holding that the right to sell is an essential attribute of property are not in point. This statute merely regulates and taxes but does not prohibit the sale. The right to hold property is also an essential attribute of ownership, and yet it is subject to the power of taxation under which the state may take the property if the tax be not paid.

The statute is not in conflict with the commerce clause of the federal Constitution (article 1, § 8). The tax is imposed only on transfers made within this state, and it operates alike on transfers made by residents, and by nonresidents without discrimination. Woodruff v. Parham, 8 Wall. 140, 19 L. Ed. 382; King v. Mullins, 171 U. S. 436, 18 Sup. Ct. 925, 43 L. Ed. 214.

What has been said disposes of the contention that the act, in imposing a tax on sales of the shares of a foreign corporation owned by a nonresident, taxes property without the jurisdiction of the state. The sale and delivery within the state confer jurisdiction to impose the tax on the transfer.

It follows that the order should be affirmed.

O'BRIEN, P. J., and McLAUGHLIN and HOUGHTON, JJ., concur.

INGRAHAM, J. (dissenting). The question presented on this appeal is as to the constitutionality of the act imposing a tax on the sale of stock being an amendment to the tax law (chapter 908, p. 795 of the Laws of 1896), chapter 241, p. 474, of the Laws of 1905. Section 315 of the tax law, as amended, provides:

"There is hereby imposed and there shall immediately accrue and be collected a tax as herein provided, on all sales or agreements to sell, or memoranda of sales or deliveries or transfers of shares or certificates of stock in any domestic or foreign association, company or corporation, made after the first day of June, nineteen hundred and five, * * * on each hundred dollars of face value or fraction thereof, two cents."

This tax now under consideration is imposed upon the sale of a specific kind of personal property, namely, the shares of stock in an incorporated company. The seller of stock must pay to the state a sum of money upon the sale of or agreement to sell the stock, and thus the right to sell is made subject to the payment to the state of the tax imposed upon that sale. The free and unrestricted right to sell property is clearly recognized in this state as an attribute of the property itself which cannot be separated from it. Wright v. Hart, 182 N. Y. 330, 75 N. E. 404. In that case, the Court of Appeals quote with approval from the opinion in Wynehamer v. People, 13 N. Y. 378, as follows:

"The right to use, buy and sell property is protected by the Constitution, and when the law annihilates the value of property, and strips it of its attributes by which alone it is distinguished as property, the owner is deprived

of it according to the plainest interpretation, and certainly within the constitutional provision intended expressly to shield personal rights from the exercise of arbitrary power."

See, also, People ex rel. Manhattan Sav. Inst'n v. Otis, 90 N. Y. 48, where it is said:

"Depriving an owner of property of one of its essential attributes is depriving him of his property within the constitutional provision."

In considering the validity of this tax, we must, I think, keep this proposition clearly in mind, that a tax is imposed upon an essential attribute of property, to be paid by any one who sells or agrees to sell it, and a failure to pay that tax is made a criminal offense punishable by fine or imprisonment. The tax is based upon a percentage of the property taxed. The statute imposes a tax on all sales or agreements to sell, or deliveries or transfers of shares of stock or certificates of stock on each one hundred dollars of the face value or fraction thereof two cents. The tax is not specific tax of so much on the sale of each share of stock, but a tax of two cents on each $100 of face value of the stock sold; and thus, the amount of the tax is fixed by a percentage of the face value of the stock that is sold. This is not a tax in the nature of a license to carry on a particular trade or occupation. Brokers who buy and sell stock are not required to obtain a license or to pay a tax for the privilege of engaging in the business of purchasing and selling stocks. It applies to all persons whether the owner or broker who sells or delivers shares of stock. The statute provides that:

"Any person or persons who shall make any sale, without paying the tax of this article imposed, or who shall in pursuance of any sale deliver any stock, or evidence of the sale of any stock or bill of memorandum thereof, without having the stamps provided for in this article affixed thereto, shall be deemed guilty of a misdemeanor."

Whoever, therefore, makes a sale of or an agreement to sell stock, whether belonging to himself or to another, or delivers any stock in pursuance of a contract of sale, must pay the tax or be subject to the penalty prescribed. The question to be considered is one of the power of the Legislature to impose such a tax; and, in considering that question, we must bear in mind the principle firmly established in this state that the constitutional validity of the law is to be tested, not by what has been done under it, but what may under its authority be done. Stuart v. Palmer, 74 N. Y. 183, 30 Am. Rep. 289. If a tax of two cents upon each $100 of the face value of each share of stock can be imposed, a tax of $10 upon each $100 of the face value of each share can be imposed which would, in effect, confiscate all shares of stock which were of the market value of $10 per share or less. If this tax is upheld, I do not see why the Legislature could not impose a tax on the sale of wheat or any other commodity, fixing an arbitrary value upon the property to be taxed, or select any other specie of property and tax a sale or delivery of it; the tax to be based upon a value, or assumed value, to be fixed by the Legislature. I should have no doubt about the power of the Legislature to impose a tax upon the sale of all personal property, all real property, or upon all property of a particular class, basing that tax upon the value of the property, or the amount at which it was actually sold; but the tax here sought to be enforced is, as

I view it, of a very different character. Shares of stock of incorporated companies are selected, and upon a sale of such stock there is imposed a tax, not based upon the value of the property or the amount for which it was actually sold, but upon what is called the face value of the stock, a value which rarely, if ever, represents its true selling value. Consideration of the principles which the Court of Appeals have applied where the question of the constitutional power of the legislature in relation to taxation has been discussed has satisfied me that this tax cannot be sustained without a violation of the constitutional provision that no person shall be deprived of his life, liberty or property without due process of law. Const. art. 3, § 6. On considering the cases, we must bear in mind that this is a tax of two cents upon each hundred dollars of face value of the stock or fraction thereof.

In Stuart v. Palmer, 74 N. Y. 183, 30 Am. Rep. 289, an act had been passed by the Legislature to lay out, open, and grade Atlantic avenue in Kings county. It provided for two assessments; one for damages awarded to the owner of the land, and another for the expenses of regulating, grading, etc. The former assessment was to be made and confirmed after proper notice to and hearing of the persons interested. The latter assessment could be made without any notice to or hearing of any person. Judge Earl, delivering the opinion of the court, says:

"I am of the opinion that the Constitution sanctions no law imposing such an assessment, without a notice to, and a hearing or an opportunity of a hearing by the owners of the property to be assessed. It is not enough that the owners may by chance have notice, or that they may as a matter of favor have a hearing. The law must require notice to them, and give them the right to a hearing and an opportunity to be heard. * * * The constitutional validity of law is to be tested, not by what has been done under it, but by what may, by its authority, be done. The Legislature may prescribe the kind of notice and the mode in which it shall be given, but it cannot dispense with all notice. * * * A tax or assessment upon property arbitrarily imposed, without reference to some system of just apportionment could not be upheld. * * * What one pays for taxes and assessments is taken for the public good, and can be justified upon no other theory. Private property cannot be taken for private purposes, even under the legislative power of taxation. Taxation and assessment imply apportionment. Each person must share the burdens of taxation and assessment equally with all others in like situation. * * * The Legislature can no more arbitrarily impose an assessment for which property may be taken and sold, than it can render a judgment against a person without a hearing. It is a rule founded on the first principles of natural justice older than written Constitutions, that a citizen shall not be deprived of his life, liberty, or property without an opportunity to be heard in defense of his rights, and the constitutional provision that no person shall be deprived of these 'without due process of law' has its foundation in this rule. * * * 'Due process of law' is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life, liberty, or property, whether the proceeding be judicial, administrative or executive in its nature."

And the learned judge then calls attention to a large number of cases which upheld the contention that, where a tax is based upon the value of property, before such a tax can be imposed the owner of the property or the person liable for the tax is entitled to notice so that he can be heard before the tax is imposed.

The same question was presented in Remsen v. Wheeler, 105 N. Y. 573, 12 N. E. 564. In that case an assessment for water rates upon

97 N.Y.S.—35

a vacant lot in the city of Brooklyn made under the act in reference to the supply of said city with water where no notice was given to the owner of the levying of the assessment, or opportunity for him to be heard, was held to be illegal, and void. The act in that case provided that the water board should, in every year, by resolution, fix the price which should be assessed upon every vacant lot situated upon any street, lane, alley, or court through or into which distributing pipes had been laid until the bonds issued for the construction of said works, with the interest thereon, should have been paid; and that sum so assessed, together with percentage of defaults, should be a lien upon the said premises respectively, and in determining this case, the court say:

"The lots of the plaintiffs were vacant, and hence were assessed and assessable for water rates under this section. As no use of the water could be made upon vacant lots, it must have been intended that whatever assessment was made upon them under this section was to be apportioned according to the value of the lots, or the benefits of them, or the cost of bringing the water to them, respectively. It cannot be supposed that it was the legislative intent or the practical operation of the section that a vacant lot worth $1,000 should be assessed for water rates as much as one worth $100,000. Unless this section requires the assessment for water rates upon vacant lots to be imposed and apportioned according to values, benefits or costs, it could not be justified as a scheme of taxation, and would be obnoxious to constitutional objections. Therefore, in reference to the imposition of these assessments, as in reference to the imposition of other assessments and taxes, the lot owners were entitled at some stage of the proceeding to a notice and an opportunity to be heard; and unless the law gave them the right to notice and an opportunity to be heard before the board, which was authorized to impose the assessment, it was unconstitutional and void, for the reason stated in Stuart v. Palmer, 74 N. Y. 183, 30 Am. Rep. 289."

And although there was a dissenting opinion in that case, this proposition was not disputed, Judge Finch, in his dissenting opinion, stating:

"Section 24 authorizes them to 'fix the price which shall be assessed' * * * 'upon every vacant lot situated upon any street, lane, alley, or court through or into which distributing pipes shall have been laid,' and makes the 'sums so assessed' and the 'percentage for default' a lien upon the lands and to be enforced like other assessments. No notice to any one and no opportunity to be heard is given by the act, and it is wholly immaterial whether the water is used or not, and the plaintiffs contend that for such defect the act is unconstitutional and the water rates absolutely void. These water rates, at least as to vacant property, are called assessments and are in their nature such, and it is difficult, if not impossible, to see how they can be sustained."

In Nehasane Park Association v. Lloyd, 167 N. Y. 431, 60 N. E. 741, the question of the constitutionality of an act authorizing the commissioners to levy a tax of 15 cents on each 100 acres of the land described in the county of Lewis and 10 cents on each 100 acres of the land described in the counties of Hamilton and Herkimer, was discussed, the court saying:

"The Legislature thus created a special tax district and then provided that all lands within that district should be taxed at a specified sum per acre, without any regard to the value of the lands, or the benefits to be derived from the improvement. The statute did not give to the landowner a hearing or an opportunity to be heard in regard to the apportionment of the tax. It was a uniform burden fixed by the Legislature itself upon all lands within the district irrespective of their value, or their relation to the proposed im-

provement, or any special benefit to be derived from the construction of the road. We are not prepared to say that the statute was a valid exercise of power under the Constitution. It has been generally understood that a fixed and arbitrary sum, assessed by statute upon property and imposed without reference to some system of just and equitable apportionment, and without any opportunity to the owner to be heard, cannot be upheld"—citing Stuart v. Palmer, 74 N. Y. 183, 30 Am. Rep. 289; McLaughlin v. Miller, 124 N. Y. 510, 26 N. E. 1104; Remsen v. Wheeler, 105 N. Y. 573, 12 N. E. 564; Spencer v. Merchant, 125 U. S. 345, 8 Sup. Ct. 921, 31 L. Ed. 763; Norwood v. Baker, 172 U. S. 269, 19 Sup. Ct. 187, 43 L. Ed. 443; Jones v. Town of Tonawanda, 158 N. Y. 438, 53 N. E. 280; Cooley on Taxation, 243, 244.

In discussing the constitutionality of the original Collateral Inheritance Tax, which imposed a tax of $5 on every $100 of the clear market value of the property transferred, Judge Earl, delivering the opinion of the court, in Matter of McPherson, 104 N. Y. 306, 10 N. E. 685, 58 Am. Rep. 502, says:

"The power of the Legislature over the subject of taxation, except as limited by constitutional restrictions, is unbounded. It is for that body, in the exercise of its discretion, to select the objects of taxation. It may impose all the taxes upon lands, or all upon personal property, or all upon houses or upon incomes. It may raise revenue by capitation taxes, by special taxes upon carriages, horses, servants, dogs, franchises and upon every species of property and upon all kinds of business and trades. * * * It is not very important to determine in this case whether the act of 1885 is to be regarded as imposing a tax upon property or upon the succession or devolution of property by will or intestacy. In either case it is a special tax. In the one case it is a tax upon the particular class of property, and in the other case a tax upon the succession or devolution of property, or the right to receive property in the cases mentioned in the statute. Whether it be one or the other it is free from constitutional objection. It has never been questioned that the Legislature can impose a tax upon all sales of property, upon all incomes, upon all acquisitions of property, upon all business and upon all transfers. * * * If this be regarded as a tax upon property, then it is free from constitutional objection if it be equally imposed and properly apportioned upon all the property of the class to which it belongs. * * * A tax imposed for the general welfare upon a particular house, or the houses of a particular neighborhood, would be amenable to constitutional objection, but if imposed upon all the houses in the state, then it is a tax imposed upon all the property of that class, and is amenable to no objection. * * * The tax is imposed according to the value of the legacy and collateral inheritance liable to be taxed, and hence there must be some mode of ascertaining that value; and for that purpose judicial action is requisite at some stage of the proceeding before the liability of the tax payer becomes finally fixed. He must have some kind of notice of the proceeding against him, and a hearing or an opportunity to be heard in reference to the value of his property, and the amount of the tax which is thus to be imposed. Unless he has these, his constitutional right to due process of law has been invaded."

The case of Bell's Gap Railroad Company v. Pennsylvania, 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892, presented a question as to whether an assessment of a tax of three mills upon the nominal or face value of bonds issued by a corporation, instead of assessing it upon the actual value of the bonds was valid. It was held that:

"This might have been subject to question under the state laws; but the state courts have upheld the assessment as valid. We are to accept it, therefore, as part of the state system of taxation, authorized by its Constitution and laws."

In determining that the tax did not violate any provision of the Constitution of the United States, it was said:

"We do not perceive that the assessment in question transgresses this provision. There is no unjust discrimination against any persons or corporations. The presumption is that corporate securities are worth their face value."

And, in speaking of the power of the state to adjust its system of taxation, it was said:

"It may, if it chooses, exempt certain classes of property from any taxation at all, such as churches, libraries and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the state legislature, or the people of the state in framing their Constitution."

This case has no relation to the construction that the courts of this state have given to the provisions of the state Constitution; and it seems there to have been based upon a presumption that a bond or other obligation for the payment of money by a solvent debtor is presumably worth the face value of the obligation; a presumption which certainly does not apply to shares of stock which, although having what is called face value, are not obligations to pay a sum of money, but which simply represents an undivided interest in the assets of the corporation after payment of its debts. Those assets may greatly exceed the face value of all its capital stock, or their value may be much less than this face value. There is certainly no presumption that a stock is worth more or less than the face value.

Assuming that the Legislature would have the power to impose a tax* upon the sale of stock based upon the value of the stock, or the amount for which the stock was actually sold, I think it is within the prohibition of the Constitution for the Legislature to impose a tax not upon the value of the property sold; not upon the price at which the property was sold, but upon an amount which the Legislature should fix as the value of the property sold, and as I view it, this is just what this statute under consideration does. It fixes the face value of the stock as the basis upon which a tax is imposed, and requires the payment upon each sale of the stock of a percentage of that face value. The Attorney General in his brief, states that:

"This act is really an extension of the present transfer tax laws of New York. * * * Sales and transfers of stock, even though they occur every day, are in no wise different from transfers occurring by deed or will, to take effect at death. Both are different methods of alienation. If, therefore, the Legislature has constitutional power to fasten a tax or impose upon transfers by will, particularly when they are not gratuitous, it would seem beyond question that they have equal power to fasten tax upon transfers during life by sale of stock."

Assuming that this is a correct statement and the constitutionality of this act is to be determined by the application of the rules which were applied in determining the constitutionality of the transfer tax, it seems to me that under the decision of the Court of Appeals in Mat-

ter of McPherson, supra, this tax cannot be sustained for the reason, as before stated, that the amount of the tax is not fixed upon the actual value of the property sold or the amount for which it was sold, but upon an arbitrary valuation fixed by the Legislature, the tax imposed being a percentage of the face value of the stock and not of its actual value. In the McPherson Case it was expressly held that the transfer tax could not be upheld unless it provided for a notice to the taxpayer and gave him an opportunity to be heard in relation to the value of the property upon which the tax was imposed before the imposition of the tax. It would seem to follow, therefore, that if that act had imposed a tax upon the face value of every share of stock which passed by will or the intestate laws, regardless of its actual value, it would have been void. If the Legislature could impose a tax based upon a percentage of the face value of the shares of stock, I can see no reason why it could not value each share of stock sold at $100 a share, and impose a tax of a percentage of the value of the stock thus arbitrarily fixed. Under the authorities before cited, the Legislature could not, without providing for a notice to or a hearing of the owner of a piece of real property, impose on each piece of real property a fixed tax, or arbitrarily fix the value of each piece of property at a certain amount, and require the payment of a percentage of that value as a tax upon the property. Nor could the Legislature upon a sale of property require the owner thereof to pay a percentage of the value of the property fixed by the Legislature, but which is not based in some way upon its actual value.

There are many shares of stock of a face value of $100 each, which do not sell for $10. The tax upon such a share would be 2 cents on $10. There are stocks of the face value of $100 per share which sell for over $4,000 per share. Upon the sale of a share of that stock, the tax would be 2 cents on $4,000, certainly an inequality in the tax which is unparalleled in any system of taxation of which I have ever heard. If the Legislature could impose a tax of 2 cents upon each $100 of the face value of every share of stock sold, it could impose a tax of $10 upon each $100 of the face value of every share of stock sold, and thus confiscate all stock which did not sell for more than $10 per share.

We are not unmindful of the decision which involved the validity of the United States revenue tax of 1898, reported in 115 Fed. 207, affirmed by the Supreme Court of the United States in 192 U. S. 363, 24 Sup. Ct. 305, 48 L. Ed. 481. The discussion in that case depended entirely upon the right of Congress to impose a tax upon the sale of stock; a power which I have no doubt the Legislature of this state possesses. The question as to the method to be adopted in ascertaining the amount of such a tax was not discussed, and this particular question does not seem to have been presented in that case. The power of taxation given to Congress and the limitation of that power by the federal Constitution present an entirely different question than that presented by the limitation of the power of the Legislature in regard to taxation by the Constitution of this state, and it is with the latter question that we have to deal in this case, and the construction given to the state Constitution by the courts of this state is to control. As I

view it, it is the method adopted by which the amount of the tax that is imposed is ascertained which violates the fundamental law of the state. For that reason, the tax cannot be sustained.

Other questions are presented on this appeal, which, in view of this conclusion, are not considered; but for the reasons stated, the order appealed from should be reversed, and the relator discharged.