THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. REUBEN WELLER, Appellant.

First Department, November 30, 1923.

**Constitutional law — police power — General Business Law, art. 10-B, prohibiting resale of theatre tickets except by person duly licensed by State Comptroller and prohibiting resale at greater advance than fifty cents is valid exercise of police power.**

Article 10-B of the General Business Law, prohibiting the resale of theatre tickets except by persons duly licensed by the State Comptroller upon the payment of a fee of $100 and upon proof satisfactory to the Comptroller of the moral character of the applicant and prohibiting the resale of theatre tickets at a greater price than fifty cents above the box office prices, is a valid exercise of the police power and is constitutional.

CLARKE, P. J., and FINCH, J., dissent.

APPEAL by the defendant, Reuben Weller, from a judgment of the Court of Special Sessions of the City of New York, rendered against him on the 16th day of February, 1923, convicting him of a violation of section 168 of the General Business Law (as added by Laws of 1922, chap. 590).

*Louis Marshall* of counsel [*James Marshall* with him on the brief], for the appellant.

*Joab H. Banton,* District Attorney [*Robert D. Petty,* Deputy Assistant District Attorney, of counsel; *Felix C. Benvenga,* Deputy Assistant District Attorney, with him on the brief], for the respondent.

MARTIN, J.:

The information charged that the defendant " on the 26th day of October, 1922, at the City of New York, in the County of New York, unlawfully did engage in the business of reselling tickets of admission to a theatre and place of amusement, and did resell to one John Cunniff a ticket of admission to a certain theatre and place of amusement called Palace Theatre, without first having obtained the necessary license therefor, from the Comptroller of the State of New York as required by law." The defendant was convicted and sentenced to pay a fine of twenty-five dollars, or in default of payment to stand committed to the City Prison for five days.

The General Business Law was amended by chapter 590 of the Laws of 1922 by inserting therein a new article 10-B, which reads in part as follows:

22

**338**      . PEOPLE *v.* WELLER.

First Department, November, 1923.     [Vol. 207

" THEATRE TICKETS.

" \*   \*   \*.

" § 167. Matters of public interest. It is hereby determined and declared that the price of or charge for admission to theatres, places of amusement or entertainment, or other places where public exhibitions, games, contests or performances are held is a matter affected with a public interest and subject to the supervision of the State for the purpose of safeguarding the public against fraud, extortion, exorbitant rates and similar abuses.

" § 168. Reselling of tickets of admission; licenses. No person, firm or corporation shall resell or engage in the business of reselling any tickets of admission or any other evidence of the right of entry to a theatre, place of amusement or entertainment, or other places where public exhibitions, games, contests or performances are held without having first procured a license therefor from the Comptroller. Such license shall be granted upon the payment by or on behalf of the applicant of a fee of one hundred dollars and shall be renewed upon the payment of a like fee annually. Such license shall not be transferred or assigned, except by permission of the Comptroller. Such license shall run to the first day of January next ensuing the date thereof, unless sooner revoked by the Comptroller. Such license shall be granted upon a written application setting forth such information as the Comptroller may require in order to enable him to carry into effect the provisions of this article and shall be accompanied by proof satisfactory to the Comptroller of the moral character of the applicant."

By the terms of the statute under which the defendant was convicted, which became a law April 12, 1922, all persons are prohibited from engaging in the business of reselling theatre tickets, unless they first obtain a license from the State Comptroller. The act also places a restriction on the price which licensed ticket sellers may charge the public for theatre tickets over " the box office prices," the prices at which they have been purchased by the speculator. The price may not be increased more than fifty cents over that charged by the theatre, which price must be printed on the face of the ticket. (See General Business Law, § 172, as added by Laws of 1922, chap. 590.)

The constitutionality of this act is challenged upon the ground that the statute violates section 6 of article 1 of the State Constitution and section 1 of the 14th Amendment of the Federal Constitution. It is asserted by the appellant that the power sought to be exercised by virtue of the statute in question is not within the police power. It is principally contended by defendant that the statute is unconstitutional because of an illegal interference

with his calling and because of its price-fixing feature, it being asserted that this feature is so interwoven with the licensing provision that in any event the entire statute must fail.

It is argued for the People that the whole statute is constitutional; that the operation of places of amusement is a matter " affected with a public interest; " that there is a right in the Legislature not only to license such places but to fix the prices at which tickets may be resold by a ticket speculator or broker.

The ticket speculator is described and his business explained in *Collister* v. *Hayman* (183 N. Y. 250, 254) where the court said: "A ticket speculator is one who sells at an advance over the price charged by the management. Speculation of this kind frequently leads to abuse, especially when the theatre is full and but few tickets are left, so that extortionate prices may be exacted. A regulation of the proprietor, which tends to protect his patrons from extortionate prices is reasonable and he has the right to make it a part of the contract and a condition of the sale. Unless he can control the matter by contract and by conditions appearing upon the face of the ticket which is evidence of the contract, he may not be able to control it at all, but must leave his patrons to the mercy of speculators, such as the plaintiff, who, as he alleges, was accustomed to make at least $4,000 a year from his business. That amount, of course, came out of patrons of the theatre and if other ticket speculators carrying on the same business at various theatres in the city of New York are equally successful, the additional expense to theatre-goers must be very large."

There seems to be ample evidence that the calling of the ticket speculator has been associated with certain abuses, and all efforts to remedy these, we are told, have been in vain. The managers of theatres profess to be unable to cope with the evil, asserting that they have made efforts to do so. Governor Miller, when signing the act now under consideration, gave expression to a popular sentiment when he said the bill was aimed at " an undoubted abuse." The Legislature of this State has said in passing this act that there is a great necessity therefor. The act was prefaced by the following section: " It is hereby determined and declared that the price of or charge for admission to theatres, places of amusement or entertainment, or other places where public exhibitions, games, contests or performances are held *is a matter affected with a public interest* and subject to the supervision of the State for the purpose of safeguarding the public against fraud, extortion, exorbitant rates and similar abuses."

An excerpt from the opinion in the case of *People* v. *Newman* (109 Misc. Rep. 622, 660), another one of the cases now under

consideration, also indicates the necessity for legislation to remedy the admitted abuses. The court said: " I am not unappreciative of the fact that this ordinance was passed in answer to a widespread public demand to prevent ticket brokers from charging extortionate prices for admission to theatres where popular entertainments are produced, the result being that persons of ordinary means find it almost impossible to purchase tickets for such plays or are required to wait weeks, if not months, before the privilege is accorded to them to witness such performance at a reasonable price.

" Both the theatre and the ticket speculator thrive because the public is willing to pay any excessive price that may be asked.

" There is no doubt that the evil flowing from this business should be corrected, but the relief unfortunately, for the reasons already pointed out, cannot come through the courts for the courts are merely the interpreters of the law. In California and Illinois the people have sought to remedy a similar situation, but the legislation was declared to be unconstitutional.

" The remedy, in my judgment, can come from the producing managers of the theatres. This can be accomplished through the medium of a contract entered into between the producing managers of the theatres and ticket brokers to sell tickets at reasonable prices. This arrangement can be made effective if the parties will act in good faith. Fixing reasonable prices for theatre tickets will not violate the law of monopoly because entertainments of the stage do not come within the inhibition of the anti-monopoly law. In fact, the entire subject is within the absolute control of the producing managers of the theatres as was pointed out in *Collister* v. *Hayman.*"

Further evidence of abuses which flow from the business of ticket speculating is furnished by the legislation that has been passed in a number of the States, aimed at improving the conditions surrounding the sale and distribution of tickets.

In the city of Chicago the people were confronted with similar abuses, and a law enacted to provide a remedy was upheld in the case of *People ex rel. Cort Theatre Co.* v. *Thompson* (283 Ill. 87). At page 90 the court, passing on the validity of an ordinance of the city of Chicago, said: " The question to be determined is whether, in granting a license to conduct a place of public amusement subject to regulation and the police power, a provision that the licensee shall not enter into an arrangement with ticket brokers or scalpers under which the licensee and the ticket brokers or scalpers both represent that the ticket brokers or scalpers are independent dealers and owners of tickets when in reality they are not owners but confederates, and the ticket brokers or scalpers sell the tickets at

higher prices for the joint benefit of the licensee and themselves, and by means of falsehood and misrepresentation that all tickets to a performance have been sold a portion of the public are required to pay higher prices for the same accommodations than others, is an invasion of rights guaranteed by the State and Federal Constitutions."

Places of amusement may be licensed. It has been held that the operation of a theatre is subject to the power of the State or municipality to require a license. In the case of *People* v. *King* (110 N. Y. 418, 427, 428) the court said: " By the common law, innkeepers and common carriers are bound to furnish equal facilities to all, without discrimination, because public policy requires them so to do. The business of conducting a theatre or place of public amusement is also a private business in which any one may engage, in the absence of any statute or ordinance. But it has been the practice, which has passed unchallenged, for the Legislature to confer upon municipalities the power to regulate by ordinance the licensing of theatres and shows, and to enforce restrictions relating to such places, in the public interest, and no one claims that such statutes are an invasion of the right of liberty or property guaranteed by the Constitution.

" The statute in question assumes to regulate the conduct of owners or managers of places of public resort in the respect mentioned. The principle stated by Waite, Ch. J., in *Munn* v. *Illinois* (94 U. S. 113), which received the assent of the majority of the court, applies in this case. ' When,' says the chief justice, ' one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created.' In the judgment of the Legislature the public had an interest to prevent race discrimination between citizens, on the part of persons maintaining places of public amusement, and the *quasi* public use to which the owner of such a place devoted his property, gives the Legislature a right to interfere."

In *Aaron* v. *Ward* (203 N. Y. 351, 356) the court held that the business of conducting a theatre was not a strictly private business. In *Lemieux* v. *Young* (211 U. S. 489) it was held that the prevention of fraud is always a proper purpose for the enactment of laws regulating a business or occupation.

Although the theatre may serve many useful purposes, its most important functions are the promotion of public welfare and education. As the population becomes more congested in great cities, as the hours of labor become shorter, the necessity of affording recreation,

amusement and education to the inhabitants becomes more impera-tive.    Therefore, the theatre becomes more essential to the welfare of the public; it becomes more " affected with a public interest."

Historically considered, theatres may be regarded as " affected with a public interest."    A. E. Haigh in his book, " The Attic Theatre " (3d ed. at page 4), said: " To provide for the amusement and instruction of the people was, according to the Greeks, one of the regular duties of a government; and they would have thought it unwise to abandon to private venturers an institution which possessed the educational value and wide popularity of the drama."

That there is ample justification for licensing those engaged in reselling theatre tickets appears to be beyond question.    Ordi-narily tickets are not resold at the theatre.    One purchasing them from a speculator must rely upon him in many respects.    If the speculator is dishonest he may sell tickets which will not be honored at the theatre, or tickets for which there is no production to be seen. The purchaser is not on an equal footing with the speculator, and this gives the public an interest in seeing that those engaged in that occupation are persons of character suited thereto, and also in having safeguards provided which will insure protection to the public as well as an adequate remedy to those defrauded.

The overwhelming evidence shows an abuse.    It is the duty, therefore, of governmental agencies to meet the conditions and find a remedy.    It is idle to say that the State and city are powerless to prevent fraud and extortion in the resale of theatre tickets. The evils of theatre ticket speculating are undisputed.    The street speculator in particular has become a nuisance.    His purpose is to prey on the people by selling his tickets at an extortionate price.

A statute which requires a ticket speculator to obtain a license and thus protect the public is constitutional.    In *People ex rel. Armstrong* v. *Warden, etc.* (183 N. Y. 223, 226), the court said: "All business and occupations are conducted subject to the exercise of the police power.    Individual freedom must yield to regulations for the public good.    It may be laid down as a general principle that legislation is valid which has for its object the promotion of the public health, safety, morals, convenience and general welfare or the prevention of fraud or immorality."

A similar rule was laid down in *People* v. *Beakes Dairy Co.* (222 N. Y. 416, 427), where the court said: " Any trade, calling or occu-pation may be reasonably regulated if ' the general nature of the busi-ness is such that unless regulated many persons may be exposed to misfortunes against which the Legislature can properly protect them.' "

It appears from the record in this case that the control of admis-

sion tickets to theatres and other places of public amusement is largely in the hands of a comparatively small number of the so-called ticket speculators or brokers. They constitute in a large measure the distributors of theatre tickets to the general public. Millions of tickets are sold annually to the public by the speculators. Frequently they purchase the most desirable part of the house for the whole season. Any regulation, therefore, relating to the sale of tickets for admission to theatres and places of public amusement, which does not take into account the persons who in practice control admission to such places, would be of little value so far as the general public and the general public interests are concerned. It is, therefore, clearly a business subject to legislative control and regulation.

In the face of the overwhelming and undisputed evidence of an abuse, we are told that the sole remedy must come from the producing managers of the theatres. To concede that there is no cure for the evil excepting through a remedy initiated by the managers of theatres, would be to admit that, on account of constitutional restrictions, the State in this instance is without power to promote the general welfare of the People by legislating to meet the evil, to accomplish a plain governmental purpose.

In *People ex rel. Durham R. Corp.* v. *La Fetra* (230 N. Y. 451) the court after adverting to the conditions which called for a remedy said: " Curative action is needed. While some may question whether it may be said without exaggeration that these enactments promote the public health or morals or safety, they do in a measurable degree promote the convenience of many, which is the public convenience, and the public welfare and advantage in the face of the extraordinary and unforeseen public exigency, which the Legislature has, on sufficient evidence, found to exist.

" The conclusion is, in the light of present theories of the police power, that the State may regulate a business, however honest in itself, if it is or may become an instrument of widespread oppression (*People* v. *Beakes Dairy Co., supra,* and cases cited; *Payne* v. *Kansas,* 248 U. S. 112); that the business of renting homes in the city of New York is now such an instrument and has, therefore, become subject to control by the public for the common good; that the regulation of rents and the suspension of possessory remedies so far tend to accomplish the purpose as to supervene the constitutional inhibitions relied upon to defeat the laws before us. (*Marcus Brown Holding Co.* v. *Feldman,* 269 Fed. Rep. 306.) "

The chief attribute of the police power is that it is flexible and adaptive, that it expands to meet new conditions and keeps pace with new developments. (*Eubank* v. *Richmond,* 226 U. S. 137,

142; *Hadacheck* v. *Los Angeles*, 239 id. 394, 410.)   The rights of the community are the supreme consideration to which those of the individual must yield.   As said by the court in *Union Dry Goods Co.* v. *Georgia P. S. Corp.* (248 U. S. 372, 375): "That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court."

We find many exercises of this power in recent times which formerly might have been considered of doubtful validity.   A striking instance of this broadening of the police power and a departure from earlier decisions is the case of *Klein* v. *Maravelas* (219 N. Y. 383, 384, 386) where the court, construing the Sales in Bulk Law, said the decision in the earlier case of *Wright* v. *Hart* (182 N. Y. 330) was *wrong*.   The latter case had been decided about ten years before *Klein* v. *Maravelas*.

The situation in relation to the statute now under review is in many respects similar to that which existed when the law was passed to prevent fraudulent sales in bulk, which law was known as the " Sales in Bulk Law."   The sole purpose of that law was to remedy an admittedly widespread evil and prevent fraud.   When the statute first came before the Court of Appeals it was held unconstitutional. Thereafter courts in many of the States of the Union, the Federal courts, and the United States Supreme Court, held similar statutes constitutional.

The Court of Appeals of this State, in the case of *Klein* v. *Maravelas* (*supra*) then held a sales in bulk law constitutional, and said: " Since *Wright* v. *Hart* was decided, the validity of like statutes has been upheld in two cases by the United States Supreme Court, *Lemieux* v. *Young* (211 U. S. 489); *Kidd, Dater & Price Co.* v. *Musselman Grocer Co.* (217 U. S. 461).   Objection to this statute on the ground of conflict with the Federal Constitution has thus been removed.   We have still to determine, however, whether there is any conflict with our State Constitution; and that requires us to say whether we shall adhere to our decision in *Wright* v. *Hart*.

" We think it is our duty to hold that the decision in *Wright* v. *Hart* is wrong.   The unanimous or all but unanimous voice of the judges of the land, in Federal and State courts alike, has upheld the constitutionality of these laws.   At the time of our decision in *Wright* v. *Hart*, such laws were new and strange.   They were thought in the prevailing opinion to represent the fitful prejudices of the hour (*Wright* v. *Hart, supra*, at p. 342).   The fact is that they have come to stay, and like laws may be found on the statute books of every State.   *   *   *"

The reasoning of the dissenting opinion in *Wright* v. *Hart* (182 N. Y. 346), written by Judge VANN, which was afterwards referred to with approval by the United States Supreme Court in the case of *Lemieux* v. *Young* (211 U. S. 489) sustains the validity of the act now before the court. It was said by him: " The question before us is one of power, not of policy. Courts may pass upon the power of the Legislature, but not upon its policy. Statutes, whether wise or unwise, are equally binding upon us, provided no provision of either Constitution is molested. According to the general rule, unless there is a plain conflict between a statute and the Constitution, the statute stands, for every presumption is in its favor. * * *

" Starting always with the presumption that the statute, although challenged, is valid, we study it in connection with the Constitution to see whether there is such a conflict as to divest the Legislature of jurisdiction. If purporting to be passed in the exercise of the police power, we endeavor to see, *first,* whether there was an evil to be remedied; and, *second,* whether the remedy prescribed is ' calculated, intended, convenient or appropriate ' to suppress it and not designed to trespass upon personal rights ' under the guise of a police regulation.' * * * The police power cannot be arbitrarily exercised so as to deprive the citizen of his liberty or property, ' but a statute does not work such a deprivation in the constitutional sense, simply because it imposes burdens or abridges freedom of action, or regulates occupations, or subjects individuals or property to restraints in matters indifferent, except as they affect public interests or the rights of others. Legislation under the police power infringes the constitutional guaranty only when it is extended to subjects not within its scope and purview, as that power was defined and understood when the Constitution was adopted."

In the case now before the court, the evil having been proved beyond all question, the Legislature properly found a remedy.

The opinion of Judge VANN indicates that the remedy is a proper one. He says (at p. 354): " The legislation under consideration was intended to suppress a deep-seated evil, common in sales of a certain kind. The existence of the evil is admitted, and the right of the Legislature to provide a remedy is also admitted, but it is insisted that the remedy provided is so unreasonable that it violates the primary guaranties of the Constitution. The same claim was made when a maximum price was fixed for doing a certain kind of work, but it was rejected, because the work was done in a business affected with a public interest. [*People* v. *Budd,* 117 N. Y. 1.] The same position was taken when one State absolutely prohibited sales on margin and another options to buy or sell at a future time,

contracts which were previously valid, but both provisions were sustained by the Supreme Court of the United States, because they tended to prevent gambling. [*Booth* v. *Illinois*, 184 U. S. 425, and *Otis* v. *Parker*, 187 id. 606.] While many contracts of the kind prohibited were free from wrong, as so many were made for the purpose of gambling, all were swept away, the good and the bad alike. Is gambling a worse evil than fraud? Does it affect commerce more seriously? Is freedom of contract interfered with more by requiring notice to creditors before certain sales are made, than by forbidding certain other sales altogether? The statute is intended to interfere only with those who buy and sell in bad faith toward the creditors of the vendor. It doubtless interferes with some who act in good faith, but so do the other statutes referred to. In order to prevent injustice and fraud, legislation for time out of mind has placed some restraint upon commercial transactions, and where the Legislature has jurisdiction to act the method of suppressing the evil is wholly within its sound discretion.''

In a case such as is now before the court the police power should be exerted to protect the public.

The construction of a statute similar to the one before the court, which had for its sole object the prevention of frauds and abuses which were generally known, was upheld by the United States Supreme Court. That statute interfered with the freedom of contract, but the court said: '' That the court below was right in holding that the subject with which the statute dealt was within the lawful scope of the police authority of the State, we think is too clear to require discussion. As pointed out by VANN, J., in a dissenting opinion delivered by him in *Wright* v. *Hart*, 182 N. Y. 350, the subject has been, with great unanimity, considered not only to be within the police power, but as requiring an exertion of such power.'' (*Lemieux* v. *Young, supra.*)

In the case of *People ex rel. Armstrong* v. *Warden, etc.* (*supra,* 226), it was held that a statute passed solely for the prevention of fraud was a valid enactment. In *People* v. *Beakes Dairy Co.* (222 N. Y. 416, 427) the court held that the State might regulate a business, however honest, which might become a source of fraud. An appropriate method of meeting evils which result from the carrying on of a business is licensing on terms prescribed by law. (*State* v. *Conlon*, 65 Conn. 478; 33 Atl. Rep. 519-521.)

The State in this case is not prohibiting the carrying on of any business, nor is it discriminating against particular persons or a particular class. Any person, wishing to do so, may engage in the business of reselling tickets, but only after obtaining a license in conformity with the regulations imposed by law, one of the

conditions being that he must file a bond to guarantee the fulfillment of the obligations prescribed by statute.

The méthod now pursued in the disposal or resale of tickets was described at the trial. It is interesting in that it shows a community of interest between the theatre managers and the brokers who sell to the public, or an underwriting of the attraction by the speculator for which the public must pay. The hope or expectation that the abuses or evils in theatre ticket speculation may be remedied by the producing managers is dispelled by the testimony in this case.

David Marks testified that he was in the business of selling tickets for thirty years and was well acquainted with the ticket brokerage business; that it had been carried on for over sixty years; and that the pioneer in the business was George Tyson. He further testified that the general way in which the business is carried on is that " we have charge accounts with various people in the city of New York and outside of New York and we do a cash business, and a charge of fifty cents is still maintained in the large offices in the city of New York. * * * We are compelled to buy merchandise months in advance and if the show is a poor show the loss is ours. Q. You look upon these tickets as merchandise? A. Yes, sir. Q. Whom do you get these tickets from? A. Theatre managers. * * * We buy them in blocks, each office is allowed so many seats. * * * The theatrical managers put on a production. * * * They say to the ticket brokers that they will allow them to have a certain number of tickets for that production. * * * Q. When is that part of the arrangement made? A. Before the show is cast and before we know anything about who is in the show, we are sent for and told how many tickets we are to get and each office has to pay, is compelled to buy. Q. Who sends for you? A. The managers of the various productions * * * and the theatre owners " who say " ' We are going to produce a show four weeks from next Monday night and it is going to open at a certain theatre,' and they say, ' how many seats do you want for that show for eight weeks in advance.' We have asked for time to see how many we can use for that production at that particular theatre, we are not given time in many cases and we must purchase the number of tickets " buying and paying for them eight weeks in advance, " and we don't know the name of the show or the cast, and we are compelled to buy them at four and five dollars apiece, plus the war tax, and compelled to pay for them and pay for them at that rate for eight weeks in advance, running into an investment of fifty or sixty thousand dollars. Q. In other words you finance the theatrical performance? A. Yes, sir. Q. And you have to pay in advance? A. Yes, sir,

and it takes hundreds of thousands of dollars. Q. Suppose the play is not a success? A. They [the tickets] are left on our hands. We have a return privilege of twenty-five, sometimes fifteen and sometimes ten. * * * They [speaking of theatre managers or owners] allocate to the several ticket brokers of the city the number of tickets that they may have and the number that they are required to take if they want any tickets. * * * We have to have a private telephone to the theatre. * * * We deliver tickets to the theatre or send them to your home or leave them at your downtown office, or you stop for them on your way home. * * * If a customer insists upon two tickets or four tickets for a certain attraction and we have not got them, and the customer requests or suggests that we go out and purchase them outside, we do that, and in that case we pay the market price and still add fifty cents for our service."

This testimony gives an idea of the theatre ticket business which is carried on by the brokers, and how intimately connected it is with that of the theatre and theatre owners and managers.

It is apparent from this record that the theatres and ticket brokers have an understanding or arrangement for the resale of tickets. The modern method of selling tickets indicates that there is a working agreement between the managers or owners and the speculator or ticket broker.

By the terms of the statute in question the ticket speculator is permitted to carry on his business and is permitted to make a reasonable profit. The act is, therefore, not confiscatory. It is not attacked upon the ground that it is confiscatory or that it prevents a fair profit.

A witness for the defendant on his direct examination testified that for services rendered a ticket broker makes a charge of fifty cents; that the established rate of profit " is fifty cents, we are not allowed to charge more." This testimony referred to the increase over the box office prices of tickets obtained directly from the theatre. It is established on the record that the advance of fifty cents is the amount customarily taken by the speculator for himself, over the price he pays for the ticket. In the business itself it is established that this is a reasonable charge for the service rendered by him so that it was shown in this case that the statute does not tend to have a confiscatory effect.

In *Reagan* v. *Farmers' Loan & Trust Co.* (154 U. S. 362, 398), interpreting the decision of *Budd* v. *New York* (143 U. S. 517), it is said: " Hence there was no occasion for saying anything as to the power or duty of the courts in case the rates as established had been found to be unreasonable. It was enough that upon examina-

tion it appeared that there was no evidence upon which it could be adjudged that the rates were in fact open to objection on that ground."

It is true that the testimony is that on a resale of a theatre ticket bought from another agency the speculator still adds fifty cents for his services. This does not make it unreasonable to limit the speculator who handles the tickets to a service charge of fifty cents per ticket; for were it to be justified, the process of rehandling the tickets and adding additional charges could go on indefinitely, to the defeat of all regulation of this kind.

This combination of theatre owner or manager with speculator or broker by which the attraction is financed or underwritten by the ticket broker or speculator, tends to a monopoly which prevents the public from seeing the performance on any reasonable terms. Under the circumstances disclosed, the regulation of the business of reselling tickets would seem not only a necessary, but also a proper means of meeting the evils sought to be remedied.

In *People ex rel. Cort Theatre Co.* v. *Thompson* (*supra*, 97) the court said: " The question here is whether the Constitution protects a theatre owner in a scheme by which an applicant for a ticket is told that the house is sold out, and upon going to the ticket scalper is permitted to select the part of the house where he desires to sit and the ticket scalper turns to the telephone and directs the theatre to send up a ticket, which is sent and sold at an advanced price.

" The business of the theatre owner or manager is private in the sense that no franchise from the State is required, but it is no more private than the business of hawkers, peddlers, pawnbrokers, keepers of ordinaries, circuses or other shows and amusements which invite the public generally to attend and exist entirely by the public. A place of amusement to which the public are generally invited upon no condition but the payment of a fixed charge is public in a general sense, and it differs radically from accommodations offered by a merchant or professional man, who, while he invites everyone to enter, does so only for the purpose of selling to each individual services or merchandise."

In *Budd* v. *New York* (143 U. S. 517) the court said: " In *Sinking Fund Cases*, 99 U. S. 700, 747, Mr. Justice BRADLEY, who was one of the justices who concurred in the opinion of the court in *Munn* v. *Illinois*, speaking of that case, said: ' The inquiry there was as to the extent of the police power in cases where the public interest is affected; and we held that when an employment or business becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is

compelled to resort and by means of which a tribute can be exacted from the community, it is subject to regulation by the legislative power.' Although this was said in a dissenting opinion in *Sinking Fund Cases*, it shows what Mr. Justice BRADLEY regarded as the principle of the decision in *Munn* v. *Illinois*."

In *Ratcliff* v. *Stock Yards Co.* (74 Kans. 1, 7) the court said: " Public necessity and the public welfare are the broad general grounds upon which the right of legislative control is based, rather than that a special privilege has been conferred in consideration of which public control is conceded or required. In *Munn* v. *Illinois*, 94 U. S. 113; 24 L. Ed. 77, Chief Justice WAITE, referring to the right to regulate business under the police power said: ' The Government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good.' (page 125.) Upon these considerations the business of banking has been subjected to control, and the right to regulate the interest which may be charged for the use of money is now unquestioned. The police power is exercised in controlling the business of insurance, the operation of mills, hotels, theatres, wharves, markets, warehouses for the storage of grain and tobacco, common carriers, the collection and distribution of news, and the business of supplying and distributing water and gas. Some of these rest upon considerations of health, or the safety or the convenience of the people, but all fall within the general grounds of public necessity and public welfare."

In *Booth* v. *Illinois* (184 U. S. 429) the court said: " * * * If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law. *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Minnesota* v. *Barber*, 136 U. S. 313, 320; *Brimmer* v. *Rebman*, 138 U. S. 78; *Voight* v. *Wright*, 141 U. S. 62."

The right to fix reasonable rates to protect the public follows when a business is affected with a public interest.

In *Block* v. *Hirsh* (256 U. S. 135, 157) the court said: " But if the public interest be established, the regulation of rates is one of the first forms in which it is asserted, and the validity of such regulation has been settled since *Munn* v. *Illinois*, 94 U. S. 113."

In the case of *People ex rel. Durham R. Corp.* **v.** *La Fetra* (230

N. Y. 429, 445) the court said: " Even in the absence of an emergency, the State may pass wholesome and proper laws to regulate the use of private property. (*Lincoln Trust Co.* v. *Williams Bldg. Corp.*, 229 N. Y. 313; *St. Louis Poster Advertising Co.* v. *City of St. Louis*, 249 U. S. 269.)   Laws restricting the uses of property do not deal directly with the question whether a private business may be limited in its return to a reasonable rate fixed by a force external to the law of supply and demand.   Aside from the war power, the regulation of prices, except for public utilities, is unusual, although usury statutes which forbid the taking of exorbitant interest on the loan of money are common.   The power of regulation exists, however, and is not limited to public uses or to property where the right to demand and receive service exists or to monopolies or to emergencies.   It may embrace all cases of public interest, and the question is whether the subject has become important enough for the public to justify public action.   (*Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Brass* v. *Stoeser*, 153 U. S. 391; *German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389; *Oklahoma Operating Co.* v. *Love*, 252 U. S. 331; *Holter Hardware Co.* v. *Boyle*, 263 Fed. Rep. 134; *American Coal Min. Co.* v. *Special C. & F. Comm.*, 268 Fed. Rep. 563.) "   (See, also, *Union Dry Goods Co.* v. *Georgia P. S. Corp.*, 248 U. S. 372, 375; *Manigault* v. *Springs*, 199 id. 473, 480.)

In *Atlantic Coast Line* v. *Goldsboro* (232 U. S. 548) the court said: " For it is settled that neither the ' contract' clause nor the ' due process ' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise."

In *Munn* v. *Illinois* (94 U. S. 113, 126) the court said: " *   *   * Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large.   When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created.   He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control."

At page 134 the court further said: " *   *   *   The controlling fact is the power to regulate at all.   If that exists, the right to establish the maximum of charge, as one of the means of regulation, is implied.

In fact, the common-law rule, which requires the charge to be reasonable, is itself a regulation as to price. Without it the owner could make his rates at will, and compel the public to yield to his terms, or forego the use."

In *Rast* v. *Van Deman & Lewis* (240 U. S. 342, 366) the court in discussing *Otis* v. *Parker* (187 U. S. 606) said: " That case illustrated the reach of the power of government to protect or promote the general welfare. It sustained a provision of the Constitution of the State of California which made void all contracts for the sale of stock of corporations on margin or to be delivered at a future day. The practice had been common, its evil was disputed. It was attempted to be justified by argument very much like those advanced in the case at bar, but this court decided that the legislative judgment was controlling."

That the Legislature may fix a reasonable maximum charge for the service where the matter is one in which the public has an interest, has been settled by the decision in *Munn* v. *Illinois* (*supra*). The *Munn* case has frequently been followed, approved and extended. (*Budd* v. *New York*, 143 U. S. 517; *Brass* v. *Stoeser*, 153 id. 391; *German Alliance Ins. Co.* v. *Kansas*, 233 id. 389; *Willcox* v. *Consolidated Gas Co.*, 212 id. 19.)

One of the chief evils of the business of ticket speculation is the exaction of exorbitant rates on the part of ticket speculators. This evil has been recognized for many years.

The principle that the Legislature has a right to interfere in such a case was clearly stated in *Ratcliff* v. *Stock Yards Co.* (74 Kans. 1) as follows: " Many kinds of business carried on without special franchises or privileges are treated as public in character, and have therefore been subjected to legislative regulation and control. The nature and extent of the business, the fact that it closely touches a great many people and that it may afford opportunities for imposition and oppression, as in cases of monopoly and the like, and circumstances, affecting property with a public interest. Police regulations of the business of dealing in patent-rights have been maintained on the theory that it affords great opportunity for imposition and fraud. (*Mason* v. *McLeod*, 57 Kan. 105; 45 Pac. 76; 41 L. R. A. 548; 57 Am. St. Rep. 327; *Allen* v. *Riley*, 71 Kan. 378; 80 Pac. 952.)"

In *German Alliance Ins. Co.* v. *Kansas* (*supra*) the language of the court was as follows: " The cases need no explanatory or fortifying comment. They demonstrate that a business by circumstances and its nature, may rise from private to be of public concern and be subject, in consequence, to governmental regulation. And they demonstrate, to apply the language of Judge ANDREWS

in *People* v. *Budd* (117 N. Y. 1, 27) that the attempts made to place the right of public regulation in the cases in which it has been exerted, and of which we have given examples, upon the ground of special privilege conferred by the public on those affected cannot be supported. ' The underlying principle is that business of certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation.' "

Reliance was placed by the defendant in the court below on three cases and it is said that they are decisive of the case now before the court. An examination of the authorities relied upon shows that they are not in point. One case arose in California. In that case (*Ex parte Quarg*, 149 Cal. 79) the court was passing upon a statute which provided that it was a misdemeanor to sell or offer to sell a theatre ticket at a price in excess of that ordinarily charged by the management. That statute absolutely prohibited, by indirection, the business of ticket broker or speculator, and prohibited any one who bought a ticket from reselling it at any price beyond that which the theatre charged, allowing no compensation whatever for the service rendered in furnishing the ticket.

The other cases relied upon, namely, *People* v. *Steele* (231 Ill. 340) and *City of Chicago* v. *Powers* (Id. 560) arose in Illinois. These were very much limited by a subsequent decision of the same court (*People ex rel. Cort Theatre Co.* v. *Thompson, supra*). This latter case clearly points out the distinction between the *Steele* case, the *Powers* case and the case now before the court. In the *Steele* case, like the *Quarg* case in California, the ordinance prohibited the sale of tickets for more than the price printed thereon. In the *Powers* case the ordinance did likewise.

The statute now under consideration not only permits the resale of tickets, but allows any suitable person who desires to do so to pursue the occupation of reselling tickets. It does not limit or fix the price which the theatre may charge for tickets. It does not interfere with the sale at any price that the theatre sees fit to charge, but it provides that any one who wishes to carry on the business of reselling tickets must do so after he obtains a license, and that, when he does obtain the license, he must sell the ticket at a profit which is fair and reasonable. It strikes at the extortioner only. It prevents fraud and the exaction of an extortionate price from the people who desire to purchase theatre tickets.

This act regulates the charges of the speculator or broker. It prohibits those who have a monopoly of the tickets, made possible by arrangements with the theatres, from charging extortionate fees for " service " in securing and selling tickets.

23

We are of the opinion, therefore, that the law as enacted was not only within the police power, but that it was the duty of the Legislature to legislate on the subject.

We have, therefore, reached the conclusion that the entire statute is constitutional.

This defendant is charged with a specific crime, the crime of unlawfully reselling a ticket to a theatre or place of amusement without a license permitting such resale, in violation of the law. It was proved that he did not have a license and it nowhere appears that he ever applied for one or that an application made by him was denied. There is no question but that this defendant resold theatre tickets without securing a license, and committed the acts charged in the information.

The defendant was properly found guilty of the crime charged, and the judgment of conviction should be affirmed.

SMITH and MCAVOY, JJ., concur; CLARKE, P. J., and FINCH, J., dissent.

Judgment affirmed.